(102) Moreover, Defendants waived any qualified privilege to which the statements may have otherwise enjoyed inasmuch as defendants acted maliciously and with a reckless disregard for the truthfulness of the statements.

(103) In addition to the aforementioned conduct, plaintiff was subjected to a second act of defamation arising out of the manner in which plaintiff's employment was severed and the treatment accorded him in connection therewith.

(104) Specifically, plaintiff states that despite the fact that his employment severance had been planned for weeks and despite the fact that his severance was due to reasons other than cause, he was not given any prior notice whatsoever of his planned severance.

(105) Specifically, defendants' Elder, Appleton and Blackford conspired and designed a scheme whereby plaintiff would be removed from his office under such terms and conditions as would convey to the public that plaintiff was being removed as part of the new management strategy to clean house, that is, to rid the commission of all racist, incompetent and violent employees.

(106) In an effort to convey this message to the public, defendants Elder, Appleton and Blackford secretly planned plaintiff's removal and secretly arranged to have a member of the State's Department of Public Safety to be present for purposes of restraining plaintiff's mobility and to escort plaintiff from the premises.

(107) Specifically, upon learning that he was being discharged, a state trooper entered plaintiff's office, in the company of Donald Newton and advised plaintiff that he had to vacate the property immediately and to turn in his keys alone with any other property in his possession that beyond to the commission. Plaintiff observed that he had

26

years of accumulated items in his office and that it would be impossible for him to remove all of his property at once.

(108) Plaintiff was told that he had to remove all his property out of the commission instantly because the state trooper had been instructed to escort him out of the building and to prevent his return. The assigned officer advised plaintiff that he didn't know the rationale behind his instructions but that plaintiff had to take whatever property he could in his hands because he would not be allowed back into the building.

(109) Further, the officer explained that he could not let plaintiff out of his sight until plaintiff had exited off state property.

(110) As such, the media observed plaintiff being escorted off state property and reported this fact.

(111) Plaintiff states that the only reason he was treated in this manner was defendants' desire to convey to the public that, like Martin, plaintiff, too, was an incompetent, racist, hostile and violent person. Moreover, defendants opted to use the state trooper because the media had earlier widely publicized the fact that Martin was locked from his office and advised that if he attempted to re-enter the same, that he would be arrested for trespassing. Hence, defendants sought to convey to the public that plaintiff was being treated identical to the manner in which Martin had been treated because plaintiff possessed the same alleged reprehensible characteristics that Martin possessed, that is, that like Martin, plaintiff was incompetent, racist and violent.

(112) As a consequence thereof, many of plaintiff acquaintances telephoned him to express their sadness about his being arrested. Moreover, classmates of plaintiff's grade school children asked them why was their father arrested.

27

(113) Moreover, plaintiff states that the sole purpose of this conduct was to defame plaintiff's character and reputation and to instill fear and consternation in the minds of all future employers with whom plaintiff might seek employment.

(114) Consequently, Plaintiff suffered various forms of injuries including, but not limited to, severe forms of mental and emotional distress and depression arising out of the defamatory conduct to which he was subjected which conduct was designed to and had the effect of, defaming plaintiff character and as such has, in reality, caused plaintiff to be unable to find gainful employment in plaintiff's chosen profession.

## COUNTS (VI) AND VII
### DISCRIMINATORY REMOVAL FROM
### ACTING EXECUTIVE DIRECTOR'S POSITION AND
### INTENTIONAL INFLICTION OF EMOTIONAL DISSTRESS

(115) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV and (V) above.

(116) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was subjected to the following acts of discrimination with respect to his removal from his Acting Executive Director and that said conduct was intentionally engaged and outrageous in its impact upon plaintiff.

(117) In this respect, the facts show that defendants Blackford, Appleton and Elder were motivated by their desire to exact revenge against plaintiff due to plaintiff having made a decision, during the period plaintiff served as the Acting Executive Director of the Commission, to place defendant Appleton on administrative leave and to threaten her with disciplinary action.

28

(118) In summary, the facts pertinent to these incidents show that immediately upon Martin's departure and plaintiff being appointed Acting Executive Director, defendant Appleton commenced to act independent of Plaintiff's Office, that is, she commenced to assert that she had sole authority to manage all matters pertaining to the budget and personnel. Specifically, she commenced to refuse to implement personnel and budgetary decisions that plaintiff made, after receiving her input.

(119) After she had engaged in a series of insubordinate acts plaintiff issued her a duties and responsibilities reminder memo dated November 17, 1998. In it, plaintiff patiently and carefully explained to LeeAnn what plaintiff's concerns were and how plaintiff desired to resolve them.

(120) In response to this memo, Commissioner Robinson met with plaintiff and Appleton and spent an entire afternoon explaining the difference between her duties and responsibilities and plaintiff's duties and responsibilities. Following the meeting, plaintiff issued LeeAnn a follow-up Memo setting forth the demarcation lines that were purportedly reinforced in the meeting.

(121) Also, as a result of these activities, plaintiff began to monitor more closely defendant's Appleton's job performance. Whereupon, plaintiff learned of several instances where Appleton had either committed misfeasance and/or malfeasance in office. Due to the grievous nature of these offenses, plaintiff elected to call them to the attention of each commissioner.

(122) Plaintiff explained that these were both grave and substantial in their overall potential impact on State government. Specifically, plaintiff had learned that Appleton had: (a) failed to properly enter the pay increases for most employees into the

29

State's computerize payment system which resulted in a number of employees being unable to receive timely pay increases in their salaries; (b) had, apparently, upgraded her job pay scale classification from a MP 63 to a MP 66. Plaintiff explained that he was basing his suspicion on the fact that Appleton had, in fact, been reclassified from a pay grade MP 63, (her classification as of the time Mr. Martin employed her) to a pay grade MP 66, (her classification as of plaintiff's March 1999, memos); and (c) had failed to timely invoice the EEOC for a contract payment in an amount in excess of $900,000,00.

(123) Notwithstanding Commissioner's Robinson specific instructions, defendant Appleton refused to alter her conduct one iota. Thereupon, plaintiff issued Appleton a formal written reprimand dated January 4, 1999. Again, following the issuance of the formal written reprimand, LeeAnn's insubordinate behavior exacerbated. Notwithstanding, plaintiff continued to make every attempt, plaintiff deemed reasonable to work with her.  This was at the urging of various commissioners, including commissioners Blackford and Robinson.

(124) Despite these efforts, LeeAnn obstinate behavior intensified. Consequently, plaintiff issued her a written memo dated February 18, 1988 placing her on administrative leave.

(125) Plaintiff's decision to place defendant Appleton on administrative leave grew out of her decision to disregard a specific instruction that plaintiff had given her pertaining to a compensation request made by one of the commission's staff attorneys assigned to the Field Operations Division.

(126) Specifically, defendant Appleton was advised that plaintiff would be out of his office from February 11th and 16[th,] 1999, and would address the staff attorney's compensation request upon his return.

(127) Despite specific instruction, defendant Appleton advised the employee that she (Appleton) had denied her request and that the matter was resolved irrespective of what plaintiff may have told her to the contrary.

(128) Upon being placed on administrative leave, Appleton advised plaintiff that she had been told by both commissioners Blackford and Robinson that plaintiff didn't have the authority to either supervise or discipline her.

(129) In an effort to illustrate plaintiff's lack of authority, defendant Appleton inscribed her insubordinate attitude in a notation that she wrote on the botton of the notice placing her on leave. There she wrote: " If the commissioners do not approve this action I will return to work on Monday February 22, 1999".

(130) Traditionally, and by statute, the executive director has sole authority to hire and fire all staff personnel except for the commission's general counsel and its two deputy directors, [See CGS §46a-52 (c) –(e)].

(131) Thereafter plaintiff was required to meet with two members of the Commission's Administrative and Personnel committee, for the purpose of, among other things, explaining the basis-underlying plaintiff's decision and to advise them of plaintiff's proposed future course of action. Defendant Blackford notified plaintiff of the meeting and explained that she would not be able to attend.

(132) In proposing the meeting, Defendant Blackford advised plaintiff that it was the commissioners' desire to subject plaintiff's proposed decision with respect to

31

defendant Appleton to the same scrutiny with which they (the commissioners) had subjected plaintiff's earlier decision placing Valerie Caldwell Gaines who, at the time served as Deputy Director of the Commission's Office of Diversity, Education and Economic Services.

(133) Thereupon, plaintiff explained that the two employees were not similarly situated and that the treatment accorded Gaines was mandated by the commission's regulations which required the Executive Director to get the approval and consent of a majority of the commissioners as a condition precedent to his authority to sever a deputy director's employment.

(134) Defendant Blackford explained that they, (the commissioners) had conferred and had decided that this would be the best course of behavior.

(135) Thereafter, plaintiff meet with two members of the Commission's Administrative and Personnel committee, for the purpose of, among other things, explaining the basis underlying the decision placing Appleton on administrative leave and to advise them of plaintiff's proposed future course of action.

(136) This is the commission's standing committee that oversees all administrative and personnel matters that requires commission approval pending action by the full commission at it regular and/or special meetings.

(137) Plaintiff met with Commissioners Robinson and Williams (both black males) and set forth the facts as plaintiff saw them. As in the case with Valerie Gaines, plaintiff assured them that he did not intend to fire LeeAnn and that, to the contrary, he desired only to extract from her a commitment to unyieldingly follow plaintiff's instructions.

(138) Given this understanding, a course of activities were agreed upon that would result in LeeAnn being returned to work and the convening of a fact-finding hearing for purpose of clarifying LeeAnn's role.

(139) However, the day after plaintiff notified LeeAnn that she was to return to work, plaintiff received a telephonic message from Commissioner Blackford wherein she advised plaintiff that effective immediately LeeAnn would no longer report to plaintiff and that plaintiff was to have no further contact with her regarding any commission matter and that during this time period LeeAnn would have sole authority to handle all budgetary and personnel matters.

(140) Again, in an effort to justify this conduct, defendant Blackford advised plaintiff that the commissioners had decided to apply the same policy and procedures to this incident as they had earlier applied to the Valerie Caldwell Gaines incident. Again, plaintiff reminded defendant Blackford that the two situations were not comparable due to the positions that these employees held and the statutory treatment accorded to each position.

(141) In an effort to illustrate the difference in the procedural structure, plaintiff reminded defendant Blackford that during the incident involving Gaines he was never denied the authority to impose whatever disciplinary measures on Gaines that plaintiff deemed appropriate up to and including termination.

(142) Thereupon, plaintiff explained that it appeared to him that the commissioners were not according him the privilege of exercising the same duties, responsibilities and powers in the Appleton's situation, as he had been empowered to exercise in the Caldwell –Gaines' situation.

33

(143) In this respect, plaintiff explained that throughout the incident involving Valerie Caldwell Gaines, Commissioner Cioffi repeatedly reminded plaintiff that his appointment vested him with sole authority to make an initial decision to discharge Caldwell Gaines, subject to the consent and approval of the commissioners. Hence, plaintiff requested an explanation as to why plaintiff was given the authority to fire Caldwell-Gaines but wasn't being given the same authority with respect to defendant Appleton.

(144) Blackford's only response was that the commissioners were doing what they deemed best. She further explained that she had discussed plaintiff's performance allegations with Appleton and was convinced that Appleton's performance satisfied all applicable standards. Lastly, she explained that the commission would address all of plaintiff's concerns at its upcoming March, 1999 meeting.

(145) Thereafter, fearing that the charges were not going to be properly addressed, plaintiff filed a formal Whistle Blower complaint with the Office of the State Auditors.

(146) Hence, plaintiff states that as direct and proximate consequence of the facts setout above, defendants made their decisions to terminate plaintiff's Acting Executive Director's appointment and to appoint Elders to the Acting Executive Director's position.

(147) In this respect, Elder explained that the commissioners actively solicited her for the position. Specifically, according to Elder, she was called out of a meeting and instantaneously offered the position and was told that she had to make up her right then and there (on the spot).

34

(148) Hence, plaintiff submits that the sole reason for defendants' recruiting Elder for the position was to shield defendant Appleton from having to submit, any longer, to the pretense of plaintiff's supervisory authority.

(149) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

<u>COUNT VIII, DISCRIMINATION WITHIN THE
TERMS AND CONDITIONS OF COMPENSATION</u>

(150) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI) and (VII) above.

(151) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was subjected to the following acts of discrimination within the terms and conditions of plaintiff's compensation.

. (152) Specifically, these facts show that in October 1998, following plaintiff's Acting Executive Director appointment in July 1998, plaintiff requested the Commissioners to appoint Cheryl Sharpe as the Acting Deputy Director For Enforcement, the position plaintiff held during the preceding eight (8) years, which request they approved.

(153) Thereafter, at the commission's November 1998 Meeting, plaintiff requested the Commissioners to increase Cheryl's and plaintiff's compensation for performing duties in a higher classification in accordance with state statutes and regulations. At this meeting, during the Executive Session, defendant Appleton was asked to advise the commissioners on the appropriate salaries that should be paid.

35

(154) Prior to the meeting, plaintiff had discussed the salary issue with Appleton and was advised by her that the correct compensation formula was the mid point of the salary of the position in the higher classification. However, at the commission meeting, defendant Appleton advised the commissioners that their options were twofold. In this respect, she explained that could either elect not to increase the compensation or they could increase it by a maximum of five (5%) percent.

(155) Thereupon, plaintiff presented the commissioners with a Memo that plaintiff had received from Shaun C. McDonough, Compensation Analyst for the Office of Policy and Management which stated that it was the state practice to fix the salary for personnel holding positions in the Executive Pay Plan at the mid point of the salary range for the position held by the employee.

(156) Thereafter, during the next four months, the issue of appropriate compensation was placed on the agenda of each commission meeting. During these meetings, plaintiff requested that Appleton share with the commissioners the policy upon which she relied. For the most part, Appleton explained that she relied upon information that she had received for an analyst in the Department of Administrative Services, (DAS).

(157) In an effort to get to the bottom of the issue, plaintiff submitted a written request to DAS for clarification of the State's compensation policy for the employees in question. Thereupon, DAS' Deputy Commissioner notified plaintiff that even though the Governor had established the compensation policy contained in the Shaun C. McDonough Compensation Directive, that notwithstanding this Directive, the

36

commissioners were able to establish a difference salary formula if they choose to do so.

(158) Thereupon, plaintiff reminded DAS of the Compensation Policy Directive that DAS had given to commission in 1994, following an attempt by the commissioners to increase the salaries of its statutory office holders, (that is, the Executive Director, the Deputy Director(s) and the General Counsel), to an amount that exceeded that established in the Governor's Compensation policy but which remained within the salary range for each position.

(159) In a nutshell, in its 1994 Directive, DAS advised the commissioners that they did not have the authority to authorize the payment of a salary different from that established in the Governor's compensation policy, notwithstanding the fact that the salary established by the commissioners was within the range of compensation fixed in the Executive Pay Plan for the position.

(160) Ultimately, defendants elected to pay plaintiff $90,000 per year as apposed to the $102, 000 that plaintiff was entitled to be paid in accordance with the compensation formula established by the Governor.

(161) Additionally, plaintiff states on information and belief that defendant Elder was paid $102, 000 for the time she served as the commission's Acting Executive Director and that insofar as plaintiff has been able to ascertain, the only difference for the disparity in compensation is the gender of the respective parties.

(162) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such,

37

plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

(163) Moreover, plaintiff states that subsequent to his discharge in 1999, that he has been subjected to numerous acts of illegal discrimination, as result of plaintiff's efforts to secure re-employment with the defendant, State of Connecticut, and that each of said acts of illegal discrimination was engaged by executive branch commissioners, appointed by the Governor, and/or their designees, under color of the constitution, laws, regulations and policies of the United States and the State of Connecticut. Each of these acts are set forth in the following enumerated counts.

<u>COUNT IX, DISPARATE TREATMENT DISCRIMINATION<br>DEPPARTMENT OF PUBLIC HEALTH</u>

(164) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII) and (VIII) above.

(165) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the State Department of Public Health, due to plaintiff's race and/or gender under the following terms and conditions. Defendants' discriminatory conduct is as hereinafter set out.

(166) Sometime prior to June 1, 1999 the defendant, state of Connecticut, acting through its Commissioner of the Department of Public Health and/or his/her designee issued a vacancy announcement for its' affirmative action manager position.

(167) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

38

(168) In response to the announcement, plaintiff prepared and submitted his application.

(169) Thereafter, in early 2002, plaintiff was notified that his application had been rejected.

(170) Plaintiff submits that despite his being the best-qualified candidate for the position, his application was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, Commissioner of the Department of Public Health, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut, and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

(171) Further, plaintiff states that the named commissioner and/or his/her designee acted, at all times pertinent hereto, intentional and without regard for plaintiff's rights, that are clearly established and protected by the constitution and laws of the United States and the State of Connecticut.

(172) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT X, DISPARATE TREATMENT DISCRIMINATION
## DEPPARTMENT OF CHILDREN AND FAMILIES

(173) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), and (IX) above.

39

(174) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the State Department of Children and Families, due to plaintiff's race and/or gender under the following terms and conditions.

(175) Sometime prior to August 17, 2000, the defendant, state of Connecticut, acting through its Commissioner of the Department of Children and Families and/or her designee, issued a vacancy announcement for its' Director of Diversity and Multicultural Affairs position.

(176) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(177) In response to the announcement, plaintiff prepared and submitted his application on or about the 17th day of August 2002.

(178) Thereafter, in April of 2002, plaintiff interviewed for the position.

(179) Following Plaintiff's interview, Plaintiff was notified, on or about the 10th day of May 2002 that his application had been rejected.

(180) Plaintiff submits that despite his being the best-qualified candidate for the position, his application was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, Commissioner of the Department of Children and Families, and/or her designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-

40

discrimination laws of the United States and the State of Connecticut as hereinabove set out.

(181) Further, plaintiff states that the named commissioner and/or her designee, at all times pertinent hereto, acted intentionally and without regard for plaintiff's clearly established and constitutionally secured and protected rights.

(182) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

<u>**COUNT XI, DISPARATE TREATMENT DISCRIMINATION**</u>
<u>**JUDICIAL DEPPARTMENT, STATE OF CONNECTICUT**</u>

(183) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX) and (X) above.

(208) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the State Judicial Department, due to plaintiff's race and/or gender under the following terms and conditions.

(184) Sometime prior to the 6th day of September 2001, the defendant, State of Connecticut, acting through its Commissioner of the Judicial Department, and/or his/her designee, published a vacancy announcement for its Director of Affirmative Action position pursuant to Ad Identification # 01-3000-002-A.

(185) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(186) In response to the announcement, plaintiff prepared and submitted his application on or about the 6th day September 2001.

(187) Thereafter, plaintiff heard nothing from defendants until sometime after the 3rd day of December 2002, on which day plaintiff submitted a Freedom of Information Act request to defendant inquiring about, among other things, the status of plaintiff's application.

(188) In response thereto, plaintiff was contacted phone by Robert D. Coffey, defendant's Director of its Human Resources Management Unit, and verbally advised that subsequent to advertising the position defendant elected to not staff the same and failed to notify the applicants who submitted their applications.

(189) Notwithstanding, plaintiff submit that between the time period of January 1, 2000 and September 6, 2001, plaintiff submitted numerous other applications to staff various vacancies in defendant's Judicial Department but has never received a response from defendant respecting any of his applications.

(190) Plaintiff submits that despite his being the best-qualified candidate for these positions, his applications were nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, Commissioner of the Judicial, Department and/or his/her designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

42

(191) Further, plaintiff states that the named commissioner and/or her designee, at all times pertinent hereto, acted intentionally and without regard for plaintiff's clearly established and constitutionally secured and protected rights.

(192) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

<u>COUNT XII, DISPARATE TREATMENT DISCRIMINATION</u>
<u>CHRO'S - REGIONAL MANAGER'S POSITION</u>

(193) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV,  (V), (VI), (VII), (VIII), (IX), (X) and (XI) above.

(194) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the defendant, CCHRO, acting through its Executive Director, defendant Elders due to plaintiff's race and/or gender under the following terms and conditions.

(195) Sometime prior to November 11, 2001 CCHRO issued a vacancy announcement for a Regional Manager to be stationed in its Waterbury, West Central Office

(196) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(197) In response to the announcement, plaintiff prepared and submitted his application that, according to instructions, which application also constituted defendant's CCHRO's qualification examination.

43

(198) Thereafter, defendant, State of Connecticut's Department of Administrative Services, notified plaintiff that he had passed the eligibility examination and that this information was being transmitted to the Commission On Human and Rights and Opportunities.

(199) Plaintiff had received no further official notice about the current status of the vacancy until on or about December 1, 2002 and until plaintiff received this information plaintiff had assumed that CCHRO was still in the application and selection processes with respect to said position.

(200) As a matter of fact, until on or about December 1, 2002, plaintiff was of the opinion that CCHRO had elected to terminate its efforts to fill said vacancy due to budgetary reasons and for reason that CCHRO wanted to avoid having to staff said position with the plaintiff.

(201) Furthermore, it was plaintiff's understanding that CCHRO had elected to staff the position with temporary and acting employees until on or about December 1, 2002 when plaintiff learned of the discriminatory act as a result of an employee of CCHRO calling plaintiff residence and telling plaintiff that the position had been staffed. However, plaintiff was not advised as to the date of the incumbent's employment.

(202) The genesis of the discriminatory nature of defendants' conduct arises out of plaintiff's prior employment with Respondent, State of Connecticut, Commission On Human Rights and Opportunity, (CCHRO).

(203) In August 1991, plaintiff was employed in the Commission's deputy director for enforcement position pursuant to the recommendation of the Commission's former executive director, Louis Martin.

(204) Thereafter, in July 1998, plaintiff was promoted into the commission's executive director's position (on an acting basis).

(205) During the course of plaintiff's tenure in the Commission's deputy director's position, a hostile and public confrontation erupted between Martin and various legislators, executive officials and/or their appointees. The essence of the confrontation centered on public accusations of racism between the officials and Martin.

(206) To remedy what these officials determined to be a racially hostile and dysfunctional environment in the commission created by Martin, they opted to sever the employment of Martin and his executive staff due to the perception that Martin and his executive staff were racist and incompetent.

(207) However, in implementing this decision, the officials elected to sever the employment of only Martin's Black executive staff members. As such, plaintiff's employment was severed pursuant to this edict for reason that plaintiff was deemed to be a Black racist.

(208) Hence, despite the absence of a factual basis for doing so, plaintiff was branded with the reputation of being a racist and consequently unfit for future state employment; notwithstanding, the fact that (to the best of plaintiff's knowledge and belief), NO WHITE EMPLOYEE HAS EVER ACCUSED PLAINTIFF OF DISCRIMINATING AGAINST HIM/HER OR FILED A FORMAL COMPLAINT AGAINST COMPLAINANT ALLEGING DISCRIMINATION.

(209) In this respect, the officials' sole basis for branding plaintiff to be a Black racist was the fact that both plaintiff and Martin are Black.

45

(210) In other words, instead of these individuals making an independent determination as to whether or not plaintiff had engaged conduct that subjected any of the state's employees, irrespective of race, ethnicity, or other protected characteristics, to prohibited discrimination, these officials elected to impute to plaintiff conduct engaged by Martin that they deemed to be racially discriminatory.

(211) Moreover, as a direct and proximate consequence of these officials publicly accusing plaintiff of being a racist, this attribute has attached to plaintiff's reputation throughout state government and as a result thereof, plaintiff has been systemically and categorically denied employment consideration in the state services.

(212) Furthermore, plaintiff states that the conduct that forms the subject matter of this complaint is a mere continuation of the conduct described above and constitutes defendants' discriminatory design to deny plaintiff employment because of his race and gender in violation of the Section 46a-60 and following of the Connecticut General Statutes.

(214) IN CONCLUSION, plaintiff states that defendant, CCHRO's decision to deny him employment in their vacant managerial position was motivated by and based solely on plaintiff's race and gender and/or the race and/or gender of the successful candidate inasmuch as it was based on the premises that plaintiff is a black racist and therefore unfit for employment within the workforce of the state of Connecticut.

## COUNT XIII, DISPARATE TREATMENT DISCRIMINATION
## EASTERN CONNECTICUT STATE UNIVERSITY

46

(215) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX), (X), (XI) and (XII) above.

(216) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the President of Eastern Connecticut State University and/or his designee, due to plaintiff's race and/or gender under the following terms and conditions.

(217) Sometime prior to the 6th day of February 2002, the defendant, State of Connecticut, acting through its President and/or designee of Eastern Connecticut State University published a vacancy announcement for its Development Specialist for Institutional Advancement position.

(218) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(219) In response to the announcement, plaintiff prepared and submitted his application.

(220) Thereafter, on or about the 8th day of October 2002, plaintiff was notified that his application had been rejected.

(221) Plaintiff submits that despite his being the best-qualified candidate for this position, his application was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, President of Eastern Connecticut State University, and/or his/her designee, acted under the Constitution, laws, regulations and policies of

the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

(222) Further, plaintiff states that the named President and/or his designee, at all times pertinent hereto, acted intentionally and without regard for plaintiff's clearly established and constitutionally secured and protected rights.

(223) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT XV, DISPARATE TREATMENT DISCRIMINATION
## CONNECTICUT DEPARTMENT OF TRANSPORTATION

(224) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII) and (XIV) above.

(235) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the Commissioner of the State Department of Transportation and/or his/her designee, due to plaintiff's race and/or gender under the following terms and conditions.

(236) Sometime prior to the 1ST day of February 2002, the defendant, State of Connecticut, acting through its Commissioner of the Department of Transportation, and /or his designee published a vacancy announcement for its Legislative and Administrative One position.

48

(237) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(238) In response to the announcement, plaintiff prepared and submitted his application.

(239) Thereafter, plaintiff was notified that his application had been rejected.

(240) Plaintiff submits that despite his being the best-qualified candidate for this position, his application was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, the Commissioner of the Department of Transportation, and or his designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

(241) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

(242) Further, plaintiff states that the named Commissioner of the Department of Transportation, and /or his designee, at all times pertinent hereto, acted intentionally and without regard for plaintiff's clearly established and constitutionally secured and protected rights.

49