## COUNT XVI, DISPARATE TREATMENT DISCRIMINATION
## OFFICE OF POLICY AND MANAGEMENT

(243) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV,  (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV) and (XV) above.

(244) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the Secretary of the Office of Policy and Management and/or his designee, due to plaintiff's race and/or gender under the following terms and conditions.

(245) Sometime prior to the 14th day of June 2000, the defendant, State of Connecticut, acting through its Secretary of the Office of Policy and Management and/or his designee published a vacancy announcement for its Independent Construction Compliance Officer position.

(246) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(247) In response to the announcement, plaintiff prepared and submitted his application.

(248) Thereafter, plaintiff was notified that his application had been rejected.

(249) Plaintiff submits that despite his being the best-qualified candidate for this position, his applications was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, the Secretary of the Office of Policy and

50

Management and or his designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

(250) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

(251) Further, plaintiff states that the named Secretary of the Office of Policy and Management, and /or his designee, at all times pertinent hereto, acted intentionally and without regard for plaintiff's clearly established and constitutionally secured and protected rights.

## COUNT XVII, DISPARATE TREATMENT DISCRIMINATION
## DEPARTMENT OF CORRECTION

(252) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV,  (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV), (XV) and (XVI) above.

(253) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the Commissioner of the Department of Correction and/or his designee, due to plaintiff's race and/or gender under the following terms and conditions.

(254) Sometime prior to the 2nd day October 2002, the defendant, State of Connecticut, acting through its Commissioner, Department of Correction and/or

51

designee published a vacancy announcement for its Director of Equal Opportunity Assurance Position.

(255) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(256) In response to the announcement, plaintiff prepared and submitted his application.

(257) Thereafter, plaintiff was notified that his application had been rejected.

(258) Plaintiff submits that despite his being the best-qualified candidate for this position, his applications was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, the Commissioner, Department of Correction and/ or her designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

(259) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, Plaintiff submits that despite his being the best-qualified candidate for the position, his application was nevertheless rejected due to discriminatory reasons in violation of the state and federal laws hereinabove set out.

(260) Further, plaintiff states that the named Commissioner, Department of Correction, and /or her designee, at all times pertinent hereto, acted intentionally and

52

without regard for plaintiff's clearly established and constitutionally secured and protected rights.

## COUNT XIX, DISPARATE TREATMENT DISCRIMINATION
## DEPARTMENT OF ENVIRONMENTAL PROTECTION

(261) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV), (XV) AND (XVI) above.

(262) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the Commissioner of the department of environmental protection and/or his designee, due to plaintiff's race and/or gender under the following terms and conditions.

(263) Sometime prior to the 31ST day of October 2002, the defendant, State of Connecticut, acting through its Department of Environmental Protection, (DEP) published a vacancy announcement for its Affirmative Action Administrator position.

(264) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(265) Additionally, the application process entailed an experienced based examination that was to be administered by the State Department of Administrative Services, (DAS), Human Resources Division.

(266) As such, applicants were instructed to forward their application packages to DAS. Plaintiff submitted his application on or about the 12th day of November 2002.

53

(267) Thereafter, on or about the 4th day of December 2002, plaintiff was notified by the Department of Administrative Services that he had scored one hundred (100%) percent on the examination.

(268) Plaintiff received no further response from the Department of Environmental Protection until on or about the 4th day of February 2003. At which time plaintiff received a correspondence from Bobbi Buckner, Principal Personnel Officer, of the Human Resources Division.  The correspondence advised plaintiff that DAS had certified plaintiff "as a possible candidate for a position that DEP might fill in its Hartford Office".

(269) Plaintiff was further advised that if he continued to be interested in a position with DEP that he should contact Ms. Elizabeth Cheno and arrange for an interview.

(270) Upon plaintiff contacting Ms. Cheno, plaintiff was advised that no interview dates had been established and that plaintiff should check with the Office regularly for purpose of scheduling an interview. Plaintiff agreed to do so and engaged additional interim activities in an effort to ensure that he was given an opportunity to interview for the position.

(271) After having made several follow-up contacts, DEP personnel instructed plaintiff to prepare and submit an application to DEP because DAS had not forwarded plaintiff's application to them.  Further, plaintiff was informed that DEP needed his application so that they could ascertain whether or not it would be a waste of the department's time to schedule an interview with plaintiff, that is, that the department

54

wanted to make sure that plaintiff generally possessed the skills and abilities they were seeking.

(272) In compliance therewith, plaintiff prepared and resubmitted his application directly to DEP on or about the 28th day of February 2003.

(273) Again, after having heard nothing from DEP, plaintiff elected to contact their office on or about the 14th day of March 2003. Plaintiff did so by contacting Ms. Cheno telephonically. Plaintiff inquired as to the current status of the interview process. Ms. Cheno advised plaintiff that she would have someone to contact him.

(274) Later that afternoon, plaintiff was contacted by a DEP staff person and advised that DEP was in the process of interviewing applicants and that if he wanted to be interviewed she could schedule him an appointment. Plaintiff expressed his desire to be interviewed and an appointment was scheduled for him commencing at 1:00 pm on the afternoon of Tuesday, March 18, 2003.

(275) Subsequent to the interview, plaintiff submitted a list of references. Since then, plaintiff has had no further contact with DEP.

(276) As such, DEP has not officially rejected plaintiff's application but plaintiff knows beyond any doubt that his application has never been considered due to defendants' perception that plaintiff might be a racist because he was an acquaintance of Mr. Louis Martin, defendant, State of Connecticut's former Executive Director of its Commission of Human Rights and Opportunities or for some other illegal reason.

(277) Plaintiff submits that despite his being the best-qualified candidate for this position, his applications was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all

times pertinent hereto the defendant, the Commissioner, Department of Correction and/or his designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

## COUNT XX, DISPARATE TREATMENT DISCRIMINATION
## CENTRAL CONNECTICUT STATE UNIVERSITY

(278) The specific discriminatory conduct is as hereinafter set out. It shows that on or about the 5th day of June 2002, Defendant CCSU published an announcement of a vacancy in its Coordinator of Multicultural Affairs and Director of Affirmative Action position.

(279) The announcement listing the job qualification requirements stated that the successful candidate must possess a:

(a) Demonstrated knowledge and understanding of **human rights, equal opportunity, the rights of persons with disabilities** multicultural and **diversity issues**;

(b) Demonstrated ability to **read, interpret and apply regulations and applicable non-discrimination laws;**

(c) Demonstrated ability to **coordinate multiple programs**;

(d) Demonstrated sensitivity and concern for the rights of all people within a university setting;

(e) Demonstrate ability to promote and lead programs through the efforts of others as well as to speak to and write to a wide variety of constituent and public groups; and

(f) Minimum of **six (6) years of professional experience** in an **affirmative action OR EQUAL OPPORTUNITY PROGRAM** including **experience in the preparation of affirmative action plans.**

56

(280) Plaintiff submitted two applications, in the form of resumes to defendants. For the most part these were duplicate documents. They revealed that plaintiff possessed the requisite qualifications.

(281) Thereafter, plaintiff learned unofficially that his application had been eliminated for the application process. According to Plaintiff's understanding, the Search Committee interpreted his application as revealing an extensive background in civil rights and equal opportunity enforcement as opposed to affirmative action plans preparation, which Plaintiff understands defendants deem to be the essence of the duties and responsibilities required to perform the job.

(282) Upon receipt of this information, on or about August 11, 2002, plaintiff submitted a detailed writing addressed to defendant Richard Bachoo, in his capacity as the Chair of the Search Committee, but intended for the edification of the entire Search Committee for purpose of reviewing and interpreting the substantive contents of Plaintiff's application.

(283) Plaintiff's correspondence sought to identify and address the substantial listing of the requisite experience, knowledge(s), skills and abilities that was set out in plaintiff's application.

(284) After failing to receive a response to his inquiry, on or about August 19, 2002, plaintiff e-mailed formal notice to defendants of his intent to challenge their decision eliminating his application from further consideration and again requested the provision of certain data that would assist his need to understand defendants' selection decision.

57

(285) Thereafter, plaintiff received two responsive writings, the first of which was from defendant Bachoo who acknowledge receipt of plaintiff's August 19, 2002 correspondence and notified plaintiff that, in his capacity as Chair of the Search Committee, he would submit the new information to the Search Committee of its consideration, deliberation and decision.

(286) Instead of receiving a follow-up correspondence from defendant Bachoo, plaintiff received a writing from defendant Magnan which contained certain information that plaintiff had requested and instructed plaintiff to direct all of his future inquiries about the selection decision to defendant Magnan.

(287) Among the information submitted by defendant Magnan, was a courtesy copy of the applicants' initial screening and evaluation data form. It's entitled "Candidate Pool Report and Authorization To Interview" and is referred to as " AAP3, Search # A434 and contain three pages.

(288) The Report reveals that as a results of defendants' screening and ranking of the applicants, plaintiff had been ranked as being minimally qualified and placed in defendants' second tier of qualified applicants rankings, with an overall rating of being number eight (8) among the qualified applicants. More specifically, the Report revealed that plaintiff that of the seven applicants who were rated as being better qualified than plaintiff, six of these individuals were ranked in defendants' first tier and deemed to be the best qualified applicants and the seventh applicant was ranked above plaintiff in defendants' second tier of minimally qualified applicants.

(289) Moreover, the Report revealed that defendants entered their notation setting forth the reasons on which they relied in evaluating Plaintiff as they did.  The

notation states:   *"Resume lacked dates or clarification, most experience is in compliance not plan development and administration".* Plaintiff's name is listed on page 2, of the document under a heading that reads, "Minimally qualified". To the right of Plaintiff's name are the letters "M" for male and "B" for black. Strangely, Plaintiff notes that his race/ethnicity is the only

(290) Additionally, this information revealed that the candidate rated best qualified was Thomasina D. Carr, a black female, whom defendants subsequently selected for the position. [See Plaintiff's Exhibit #13, Defendants' Notification of the Selection of a Candidate].

(291) Plaintiff states that defendants' legitimate non-discriminatory reasons for not selecting him and for preferring Thomasina Carr for the position are mere pretexts offered to concealed defendants' discriminatory motives because said reasons are both false and lack credibility.

(292) Plaintiff submits that despite his being the best-qualified candidate for this position, his applications was nevertheless rejected due to discriminatory reasons including, but not necessarily limited to, plaintiff's race and/or gender and that at all times pertinent hereto the defendant, CCSU, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination times pertinent hereto the President and/or his designee, acted under the Constitution, laws, regulations and policies of the United States and the State of Connecticut and in violation of the anti-discrimination laws of the United States and the State of Connecticut as hereinabove set out.

## COUNT XXI, DISPARATE TREATMENT DISCRIMINATION
## DEPARTMENT OF ECONOCMIC AND COMMUNITY DEVELOPMEMT

(293) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII) and (VIII) above.

(294) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the State Department of Public Health, due to plaintiff's race and/or gender under the following terms and conditions. Defendants' discriminatory conduct is as hereinafter set out.

(295) That on or about the 8th day of May 2003, the defendant, state of Connecticut, acting through its Commissioner of the Department of Economic and Community Development and/or his/her designee issued a vacancy announcement for its' affirmative action Administrator's position.

(296) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(297) In response to the announcement, plaintiff prepared and submitted his application.

(298) Thereafter, on or about June 25, 2003, plaintiff was notified that defendant had elected not to staff said position.

(299) Plaintiff submits that the sole reason that motivated defendant to discontinue its efforts to staff said position was due to the fact that plaintiff's name appears as the number one candidate on the Department of Administrative Services list of eligible candidates and defendant DECD feared that if it continued its search it would be required to hire plaintiff despite plaintiff's reputation.

60

(300) Further, plaintiff states that the named commissioner and/or his/her designee acted, at all times pertinent hereto, intentionally and without regard for plaintiff's rights, that are clearly established and protected by the constitution and laws of the United States and the State of Connecticut.

(301) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

## DEPRIVATION OF CONSTITUTIONAL PROTECTED LIBERTY

(302) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV,  (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV), (XV), (XVI), (XVII), (XVIII) and (XIX) above.

(303) The facts pertinent to this cause of action are hereinafter setout. As previously setout these facts show that defendant, State of Connecticut, acting through its' Commission on Human Rights and opportunities employed plaintiff in August 1991.

(304) Further, they show that defendants, the named commissioners of the Human Rights Commission and a number of the defendant, State of Connecticut, elected officials, repeatedly made false statements to the media that were defaming and that resulted in stigmatizing plaintiff's reputation, good name and integrity.

(305) Specifically, they show that for a period of time in excess of two years, the identified defendants, acting in concert with their employees, agents and elected officials, among other persons, made and published, both verbal and non-verbal, false statements that plaintiff was incompetent inasmuch as defendants accused plaintiff of having mismanaged the Commission of Human Rights and Opportunities.

(306) Similarly, the identified defendants made and published other statements that accused plaintiff of being incompetent in the performance of his duties as the Commission's Deputy Director for Enforcement inasmuch as these individuals accused plaintiff of having rendered the commission dysfunctional with respect to its ability to process complaints of discrimination.

(307) In like manner, these individuals accused plaintiff of being a racist and of having subjected the commission's white employees to a pattern and practices of egregious discrimination that, according to defendants, resulted in plaintiff discriminatorily replacing all of the commission's White managerial employees with Black employees.

(308) In essence, defendants' false statements accused the plaintiff of being grossly incompetent with respect to plaintiff's ability to manage the Field Operations Division of the Commission, but they also accused plaintiff of being grossly incompetent with respect to plaintiff's ability to administer the State's anti-discrimination laws and regulations.

(309) Further the facts show that, at the time of plaintiff's discharge, defendants republished these defamatory and false allegations to the media. Specifically, defendants elected to discharge plaintiff in such a manner as to communicate to the public that plaintiff's tenure with the commission had been so disastrous as to make it necessary for them to have plaintiff forcibly removed off state property.

(310) In this respect, defendants made arrangements to have a state trooper to escort plaintiff off state property which fact was widely published in the state print media and which had the effect of communicating to all future employers, to whom plaintiff

may apply in the future, that plaintiff possessed criminal proclivities that made it necessary for defendants to invoke the state's criminal law processes in order to remove plaintiff from its' premises.

(311) In other words, plaintiff states that the manner in which defendants elected to discharge plaintiff, constitutes a non-verbal statement that was communicated to, and published by the media, which resulted in plaintiff being subjected to public opprobrium thereby damaging plaintiff's reputation and precluding all possibilities of plaintiff ability to find employment in his chosen profession.

(312) Further, the facts show that not only did defendants rely on these false statements to terminate plaintiff's employment but that defendants have consistently relied on these false statements to bar plaintiff from future employment with the State of Connecticut. In this respect, the facts show that in addition to relying on these false statements to support their decision to terminate plaintiff's employment, defendants also relied on these knowingly false statements to deny plaintiff's employment in their Director of Field operations position.

(313) Additionally, the facts show that defendants failed to provide plaintiff a process in which plaintiff could attempt to clear in name and reputation.

## COUNT XXI, DEPRIVATION OF PLAINTIFF'S RIGHT OF ASSOCIATION

(314) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV), (XV), (XVI), (XVII), (XVIII), (XIX) and (XX) above.

(315) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was terminated from employment and simultaneously denied the

63

right to compete for defendant's, Commission On Human Rights and Opportunities, Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to free speech and association in violation of the First and Fourteenth Amendments, United States Constitution; Section 3, 4, and 14 of the Constitution, State of Connecticut, and the protections afforded plaintiff by Section 31-51q, of the Connecticut General Statutes.

(316) The facts pertinent to this cause of action are hereinafter setout. As previously setout these facts show that defendant, State of Connecticut, acting through its' Commission on Human Rights and opportunities employed plaintiff in August 1999. Specifically, the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, employed Plaintiff pursuant to a recommendation made by its' recently employed Executive Director, Mr. Louis Martin. The Commission employed Martin in January 1991.

(317) Plaintiff was employed in the Commission's Deputy Director for Enforcement position. Execution of the responsibilities of this position, required Plaintiff oversee the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.), subject to the instructions and directions that plaintiff received from Louis Martin, the Commission's Executive Director and such policy directives and regulations implemented by the commission.

(318) Specifically, plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint

investigation activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

(319) The commission's hierarchical structure, including its powers and duties are set out in the Act. Essentially, the Act provides that the commission is to be governed by a nine-member panel of commissioners who are to establish commission policies and oversee its total effective and efficient operation. To achieve this goal, the Act empowers the commission with broad authority which include the hiring of the commission's Executive Director and General Counsel. Similarly, by way of the commission's duly enacted regulations, the commission must lend its advice and consent to the hiring of a deputy director.

(320) In like manner, the Act provides that the Executive Director shall serve as the chief executive officer of the commission and in this capacity the executive shall be responsible for overseeing the day-to-day operations of the commission which includes, subject to the policy making input of the commission, the authority to promulgate, administer and oversee the commission's budget, the authority to administer and oversee all personnel matters, including the hiring and firing of staff, and the responsibility of implementing the requisite processes and procedures essential to effective enforcement of the Act's, i.e., the elimination of all vestiges of discrimination made illegal by the Act.

(321) As such, in order for plaintiff (and all managerial personnel) to perform the duties and responsibilities of his job, it was essential for plaintiff to come into daily association with Mr. Martin for purposes of addressing matters of public concern, that is, the ways and means, the policies and procedures that the commission's Field

65

Operations Division was to implement and administer in its' effort to execute its' statutory mandate to eliminate all vestiges of illegal discrimination through effective and efficient complaint investigation and enforcement.

(322) During the eight plus years in which plaintiff staffed the commission's Deputy Director for Enforcement position, plaintiff (and again, all of the commission's managerial employees) was required to come into daily association with Mr. Martin the purposes set out above.

(323) Notwithstanding the need to associate with Martin for purpose of addressing issues of public concern, i.e., the effective enforcement of the Connecticut Anti-Discrimination Act, Defendants elected to discharge plaintiff for engaging the very act mandated by the statutory scheme and without which the statutory scheme could not be enforced in the collegiate manner in which the Act contemplates, that is, a hierarchical division of labor structure.

(324) In this respect, plaintiff notes that the only reason defendants have given for their decisions to discharge and not rehire plaintiff, is contained in defendants' Answer to plaintiff's original complaint. There, in their response to paragraphs 27 and 28, defendants explained that their decision to discharge not to rehire plaintiff was based on:

> " ...decisions that 'Martin and [plaintiff] made which effect was to eventually rid the commission of all of its white managers and replace them with black managers'." I

(325) Inasmuch as the facts clearly show, as setout above, that Martin possessed the exclusive authority to hire or fire staff, it's obvious that defendants'

explanation is a mere façade to hide the real reason that motivated their adverse decisions, that being, plaintiff's association with Martin.

(326) Additionally, plaintiff submits that the facts, as set out in the preceding counts, clearly demonstrate that the genesis of the problem that arose between Martin and the defendants grew out of the manner in which Martin exercised his managerial powers with respect to the commission's personnel, especially its' white personnel. From the viewpoint of defendants and many elected officials, Martin exercised these powers in a racial manner so as to subject the commission's white employees to a pattern and practice of race discrimination.

(327) However, despite the almost daily association that plaintiff (and all managerial personnel) had with Martin respecting the commission's enforcement processes and procedures, including its' staffing needs, no white employee ever accused plaintiff of having subjected him or her to race based discrimination.

(328) Hence, plaintiff submits that the facts clearly establish that his association with Martin for the purposes hereinabove set out did not interfere substantially or even immaterially with plaintiff's bona fide job performance or with plaintiff's working relationship with defendants.

(329) Consequently, plaintiff submits that defendants' decisions to discharge and not rehire plaintiff for exercising his First Amendment protected right to freedom of association constitutes a violation of plaintiff's rights as protected by the federal and state constitutions and Section 31-51q, CGS.

## COUNT XXII, DEPRIVATION OF RIGHT OF FREE SPEECH ARISING OUT OF PLAINTIFF'S WHISTLE BLOWER COMPLAINT

(330) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV), (XV), (XVI), (XVII), (XVIII), (XIX) and (XX) above.

(331) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for defendant's, Commission On Human Rights and Opportunities, Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to free speech and association in violation of the First and Fourteenth Amendments, United States Constitution; Section 3, 4, and 14 of the Constitution, State of Connecticut, and the protections afforded plaintiff by Section 31-51q, of the Connecticut General Statutes.

(332) The facts pertinent to this cause of action are hereinafter setout. Plaintiff states that within days of his notifying the commissioners of the conduct that had come to his attention respecting defendant Appleton's misfeasance and/or malfeasance in office, he also notified them of the fact that he had filed a Whistle Blower complaint with the Office of the State Auditors detailing the conduct that he had earlier called to their attention.

(333) Thereafter, within days of notifying defendants of his having filed said complaint; plaintiff was removed from his position as Acting Executive Director.

(334) Plaintiff states that he believes that defendants' decision to remove his Acting position was made in direct retaliation for his having filed the Whistle Blower complaint.

68

(335) Further plaintiff states that upon investigating the complaint, the State Auditors found that defendant Appleton had been derelict in the performance of her duty as claimed by plaintiff and that her conduct in all likelihood caused the State to lose thousands of dollars in interest payment.

(336) Additionally, plaintiff states that his filing the complaint constitutes protected speech under the laws set out in the preceding count inasmuch as the speech was on a matter of public interest and that defendants' retaliatory conduct constitutes a deprivation of plaintiff's rights protected by said laws.

## COUNT XXII, DEPRIVATION OF PLAINTIFF'S RIGHT TO EQUAL PROTECTION OF THE LAW

(337) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III, IV, (V), (VI), (VII), (VIII), (IX), (X), (XI), (XII), (XIII), (XIV), (XV), (XVI), (XVII), (XVIII), (XIX), (XX) and (XXI) above.

(338) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for defendant's, Commission On Human Rights and Opportunities, Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to the equal protection of the law.

(339) In support of this cause of action plaintiff states that to the extent defendants elected to terminate plaintiff's employment and refuses to rehire plaintiff due to plaintiff having associated with Martin on the same terms and conditions as did all of the commission's white managerial employees, that said treatment constitutes a

69

deprivation to plaintiff's constitutionally protected rights to equal treatment under laws of the United State and State of Connecticut.

## REMEDIAL RELIEF

WHEREFORE, premises considered, Plaintiff prays that this court schedule this matter for trial on the merits before a jury of plaintiff's peers and thereupon, after duly considering all the relevant and material evidence, enter its Order awarding plaintiff's such relief as he maybe entitled, in equity and at law; and for all other necessary and proper relief.

Respectfully Submitted,

Jewel E. Brown.

By:

Jewel E. Brown, pro se
21 BREWSTER
SOUTH WINDSOR, CT. 06074
PHONE (860) 644-5379
FAX (860) 644-6551
E-MAIL: employmentpa@aol.com

## CERTIFICATE OF SERVICE

Plaintiff hereby certifies that he has caused a copy of the foregoing going pleading to be served upon Defendants' Attorneys this 27th day of April, 2004, by depositing a copy of the same in U. S. mail, postage prepaid, and addressed to Defendants' Attorneys' address shown of record in this matter.

Respectfully submitted

By:

Jewel Brown, pro se

70