## IN THE UNITED STATED DISTRICT COURT
## DISTRICT OF CONNECTICUT

Jewel E. Brown,                                  )
Plaintiff,                                       )
                                                 )
VS          #3:02CV223(CFD)                      )
                                                 )
The state of Connecticut and its Commission On Human Rights   )
and Opportunities, the honorable, Nicholas Cioffi, Chair person   )
CHRO, the honorable Richard Robinson, Commissioner and   )
Chair person, CHRO, the honorable Vivien Blackford,   )
Commissioner, CHRO, Cynthia Watts Elders, Executive Director,   )
CHRO, and Lee Ann Appleton, Business Manager, CHRO,   )
The Department of Environmental Protection and its'   )
Commissioner, William "Bill" Evans; The Department of Children   )
and Families and its' Former Commissioner, Kristine Ragaglia;   )
The Department of Transportation and its' Commissioner,   )
Steve Korta; The Department of Correction and its'   )
Commissioner, Theresa Lantz; The Department of Public Health   )
and its Commissioner, Robert Galvin; The Department of   )
Economic and Community Development and its' Commissioner,   )
James F. Abromaitis; The Office of Policy and Management   )
and its' Secretary Mark Ryan; The Judicial Department, State   )
of Connecticut and its' Chief Court Administrator, Joseph H.   )
Pellegrino, Judge; Barbara Waters, Commissioner, Department of   )
Administration Services; Central Connecticut State University   )
and its President, Richard Judd and its General Counsel   )
to the President, Carolyn Magnan; Eastern Connecticut   )
State University and its' President, David Carter   )
**DEFENDANTS**                                   )
                                                 )  April 28, 2004

## PLAINTIFF'S SUBSTITUTED COMPLAINT, AS AMENDED

Comes now, Jewel E. Brown, and in support of this complaint against the

defendants, individually and collectively, alleges and states as follows:

### SECTION I: JURISDICTION

This is a suit at law and in equity authorized and instituted pursuant to First and

Fourteenth Amendments of the United States Constitution, Sections 3, 4, 14 and 20 of

United States District Court
District of Connecticut
FILED AT HARTFORD

11/10/04

By A. Montgomery

2004 APR 29 A 11: 39
DISTRICT COURT
FILED

the Constitution of the State of Connecticut, 42 USC § 2000e-5 et seq as amended; 42 USC § 1981, as amended; 42 USC 1983, Section 46a-60 et seq, and Section 31-51q of the Connecticut General Statutes. All conditions precedent to jurisdiction under 42 USC § 2000e-(f))(3) have occurred or will occur as prescribed by law.

This court's jurisdiction is invoked pursuant 28 USC § 1343, 28 USC § 1344, 28 USC § 2201 and 28 USC § 2202 providing for the equal rights of every person in every state and territory in the United States.

Also, plaintiff invokes the court's pendent jurisdiction over discriminatory practices and freedom of speech and association claims arising under the Connecticut's Discriminatory Practices Act and Section 31-51q of the Connecticut General Statutes.

Plaintiff seeks to secure the protection of and redress the deprivation of rights secured and protected by the constitution and laws of the United States and the State of Connecticut which provides for injunctive, both temporary and permanent, relief and for monetary compensation for victims of racial and gender based discrimination and similar relief for the deprivation of an individual's rights of freedom speech, association and the equal protection of the laws, among others.

## SECTION II - THE PARTIES

(1) Plaintiff, a fifty four (54) year old black male, is a citizen of the United States, residing in the state of Connecticut and in the town of South Windsor at 21 Brewster Road.

(2) Defendant, State of Connecticut, a body politic, is the governing body of the State organized and existing pursuant to the constitution and laws of the United States and the State of Connecticut.

2

(3) Defendants, Commission On Human Rights and Opportunities, Department of Public Health, Department of Children and Families, Department of Transportation, Department of Correction, Department of Environmental Protection, Department of Economic and Community Development, and the defendant, Office of Policy and Management are political subdivisions of the State of Connecticut, organized and existing pursuant to the laws of the State. Each subdivision is a component part of the executive branch of state government.

(4) Defendants, William "Bill" Evans, Theresa Lantz, Robert Galvin, Kristine Ragaglia, Steve Korta, and James F. Abromaitis, were and/or are the duly appointed Commissioners of the, Department of Environmental Protection, Department of Correction, Department of Public Health, Department of Children and Families, Department of Transportation, and Department of Economic and Community Development and at all times pertinent hereto, each of said defendants exercised ultimate appointing authority over the positions within their departments for which plaintiff applied.

(5) Defendants, Mark Ryan is the duly appointed Secretary of the Office of Policy and Management and at all times pertinent hereto, defendant Ryan exercised ultimate appointing authority over the positions within his department for which plaintiff applied.

(6) Defendant, Barbara Waters, is the duly appointed Commissioner of the State Department of Administrative Services and as such possessed statutory authority for the enforcement of the State Personnel Act and at all times pertinent hereto have permitted and/or acquiesced in the commission of the numerous violations of the Act of which plaintiff complains.

3

(7) Defendant, Judicial Department, state of Connecticut is a subdivision of the State of Connecticut and a component of the State's Judicial Branch of government.

(8) Defendant, The Honorable Joseph H. Pellegrino, Judge, is the Chief Court Administrator of the defendant, Judicial Department, and at all times pertinent hereto maintained ultimate appointment authority over the positions for which plaintiff applied.

(9) Defendants, Central Connecticut State University, (CCSU) and Eastern Connecticut State University (ECSU) are state supported institution of higher learning created and maintained in accordance with the state law(s) and charters that created, maintains and authorizes their continued existence. At all times pertinent to this complaint, defendant CCSU and ECSU were the employer whose positions plaintiff sought to staff.

(10) Defendants, the honorable Doctor, Richard Judd and David Carter are the Presidents and chief executive officers of the defendants, CCSU and ECSU and is being sued in his representative capacities only because the named defendants presided over and acquiesced into and otherwise tacitly condoned the discriminatory conduct of which plaintiff complains.

(11) Defendant, Carolyn Magnan, is the General Counsel to the President of CCSU and at all times pertinent hereto, defendant Magnan served as the appointing authority for the position in question. Defendant Magnan is being sued in her personal and representative capacities because she who knowingly and intentionally mislead the search committee members with respect to the merits of plaintiff's application and the qualificational requirements of the job.

4

(9) Defendants, Leeann Appleton and Cynthia Watts Elder are the former Business Manager and Executive Director of the Commission on Human Rights and Opportunities and at all times pertinent hereto exercised the powers of their offices in such a manner as to injury plaintiff. These individuals are being sued in their individual and representative capacities.

(10) Defendants, Vivian Blackford, Nicholas Cioffi, and Richard Robinson were and/or are either current or former member of the Connecticut commission On Human Rights and Opportunities and at all times pertinent hereto exercised appointing authority over one or more of the positions for which plaintiff applied, Defendant Blackford is being sued in her individual and representative capacities.

## COUNT I -DISPARATE TREATMENT DISCRIMINATION
## REJECTION OF PLAINTIFF'S EXECUTIVE DIRECTOR APPLICATION

The following facts are illustrative of the disparate treatment discrimination to which plaintiff was subjected:

(1) Defendants employed plaintiff on or about the 15th day of August 1991 in their Deputy Director for Enforcement position and except for the period of time commencing mid July 1998 through mid March 1999, plaintiff retained this position until his employment was severed on or about the 11th day of September 1999. During the July 1998 through March 1999 period, Plaintiff served as the Acting Executive Director of Defendants' Commission On Human Rights and Opportunities.

(2) Plaintiff was employed by the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, pursuant to a recommendation of Mr. Louis Martin, whom the Commission employed as its Executive Director in January 1991.

5

(3) As the Commission's Deputy Director for Enforcement, Plaintiff was assigned the general duty and responsibility of overseeing the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.) Specifically, plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint investigation activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

(4) Throughout Plaintiff's employment, Plaintiff performed the duties and responsibilities of his job without complaint, criticism, and/or incident. Notwithstanding, a number of the Commission's employees; especially its white employees, commenced to allege that they were being subjected to illegal race based discrimination by the Commission's Executive Director, Louis Martin and various other members of its managerial staff. As a result of these allegations, various lawsuits were filed by the Commission's white employees against Martin, Valerie Caldwell Gaines, and Femi Assegai, the latter two of whom were, at the time, serving as Manager of, and an Investigator assigned to, the Capitol Region Office in the Commission's Field Operations Division.

(5) The following acts are illustrative of the conduct, that Mr. Martin engaged that its white employees deemed discriminatory. These acts commenced in January 1992 when Martin employed Valerie Caldwell Gaines, and Femi Assegai, both black employees.

6

(6) At the time of their hire and placement, only one black employee was assigned to the commission's Capitol Region Office which employed roughly fifteen (15) employees;

(7) Shortly after the employment of these individuals, tension commenced to develop among and between the commission's white and black employees assigned to the Capitol Region Office.

(8) Thereafter, the Executive Director, at the direction and knowledge of the Commissioners launched a thorough investigation into the cause(s) and sources of the disturbances.

(9) A three-member committee of management personnel investigated the allegations. They were: Mr. William Binkley, white male, Director or Field Operation; Ms. Anita Gagnon, white female, Manager, Office of Education, and plaintiff, black male, Deputy Director for Enforcement.  Ultimately, no determinations of culpability and/or liability were made.

(10)  Thereafter, when Mr. Martin elected to promote Mrs. Gaines to the position of Manager, the Office's white employees became more and more convinced that Mr. Martin and Mrs. Gaines were conspiring to subject them to illegal race based discrimination. Throughout this time-period, Plaintiff visited frequently with Mr. Martin so that Plaintiff could fully understand the motivation for his decisions and was satisfied that they were not race based; even though Plaintiff ultimately disagreed with him as to some of the decisions that he made.

(11)  Throughout this time period, Plaintiff made it a practice to conference with all commission's employees who deemed themselves victims of Martin's decisions so

that they would at least have the benefit of Plaintiff analysis and, when appropriate, plaintiff would also share with them plaintiff's commitment to assist in their efforts to gain upward mobility in the Agency. Again, plaintiff deemed it extremely important to assure each employee that she/he would receive non-discriminatory treatment and, to the extent reasonable minds could agree, that they would also receive fair and equitable treatment.

(12) Despite these efforts, events continued to occur that white employees and white elected officials deemed to be manifestations of Martin's racist proclivities toward white persons. However, no white employee ever accused plaintiff of having subjected him or her to illegal race discrimination.

(13) In April 1996, following these developments, the Connecticut Supreme Court issued its decision in the case of <u>Angelsea vs. CHRO</u> where it held, contrary to the contentions of the Commission General Counsel's Office, that the Commission's statutory scheme mandated that it complete its investigation to all complaints filed with it within a period of nine (9) months from the date of filing.

(14) Inasmuch as the potential consequences of this decision were substantial, the decision was widely covered by the state's media. In covering the same, the media commenced to accord substantial coverage to statements made by Martin that the media deemed to suggest racial overtones.

(15) Notwithstanding the public frenzy surrounding these activities, at the request of Commission officials, the state legislature and governor passed Public Act 96-241. It contained several provisions that were intended to abate the adverse impact that the Angelsea decision would have otherwise had on those adversely affected by it. For

8

example, it stayed the dismissal effect that the decision would have had on roughly a thousand complainants whose complaints would have been dismissed due to the Angelsea decision.

(16) The Act contained additional provisions that proved to be the source of great dissension. These provisions provided that the governor and various legislative office holders would appoint members to a task force to study the Commission's complaint processes. The Task Force was to make its report to the Law Revision Commission, an arm of the state legislature.

(17) Upon learning of the Task Force, its mission and reporting responsibilities, Mr. Martin became convinced that its purpose was to undermine the accomplishments of his administration by producing a report purporting to confirm defendants publicly repeated allegations that he and his managerial staff were both racist and incompetent and that these characteristics had resulted in his administration's failure to remedy the agency's gross inability to competently implement and carry out the statutory purposes for which the agency was created.

(18) Being convinced of these purposes, Mr. Martin vowed not to cooperate with the ask Force nor the Legislation Revision Commission. However, after reaching this conclusion, Mr. Martin made his opinion known to the Agency's commissioners; Governor Rowland, his chiefs of staff; the Secretary of the Office of Policy and Management and to the General Counsel of the Office of Policy and Management who now serves as the Chairperson of the CHRO.

(19) Similarly, throughout this period, plaintiff made his disagreement with Mr. Martin known, (a privilege Martin afforded plaintiff due primarily to the expanded history

the plaintiff had with him). Plaintiff's opposition was manifested in various ways, including direct oral and written communication from plaintiff to Martin, commissioners and elected officials.

(20) Additionally, plaintiff sought and was granted permission from Martin to attend the Task Force's meetings as a resource person and, in this role, to provide the Task Force with whatever assistance plaintiff could – subject to Mr. Martin's permission.

(21) Despite the absence of a factual basis for doing so, defendants elected to impute its' perception of Martin's behavior to plaintiff. As a matter of fact, NO White EMPLOYEE EVER ACCUSED plaintiff OF DISCRIMINATING AGAINST HIM/HER OR FILED A FORMAL COMPLAINT AGAINST plaintiff ALLEGING DISCRIMINATION.

(22) Defendants' sole basis for publicly accusing plaintiff of being a racist and of being incompetent was due to plaintiff's association with Martin and the fact that both plaintiff and Martin are Black. According to defendants, these deficiencies rendered the Commission "out of control and dysfunctional."

(23) In other words, instead of defendants making an independent determination as to whether or not plaintiff had engaged conduct that subjected defendants' white employees to prohibited race based discrimination, defendants elected to impute to plaintiff conduct engaged by Martin that defendants perceived to be discriminatory.

(24) Moreover, within months of plaintiff's original employment, plaintiff promulgated and implemented a policy whereby Plaintiff sought to visit with each employee, (of whom Plaintiff learned), who perceived that he/she may have been, or was being, subjected to illegal discrimination or other unfair treatment for purpose of, (to the extent feasible) resolving the employee's concerns

(25) Plaintiff sought to apply this policy to all employees regardless of race, ethnicity, gender, etc., and whether or not the employee was within plaintiff's direct supervisory chain.

(26) Again, in evaluating Plaintiff's qualifications to staff the Commission's vacant Executive Director Position, defendants elected to impute these deficiencies to Plaintiff's performance despite clear proof to the contrary.

(27) In this respect, the undisputed facts show that plaintiff was neither a racist nor incompetent. Specifically, in addition to the fact that no white employee ever accused plaintiff of subjecting him/her to illegal discrimination, these facts also showed that the Field Operation Unit was superbly managed during this period. For example, under plaintiff's leadership the Unit either remedied, or at a minimum, implemented corrective measures capable of remedying its enforcement deficiencies. Specifically, under Plaintiff's leadership the commission a backlog of in excess of three thousand (3000) complaints was eliminated in the Field Operation Unit and a backlog of in excess of two hundred fifty (250) complaints in the public hearings Unit was eliminated.

(28) Moreover, as a direct result of initiatives and policies promulgated and implemented by and through plaintiff, the Commission's enforcement activities improved across the board. For instance, an independent Office of Public Hearings was created and staffed.

(29) Despite plaintiff's achievements, open hostility and confrontation broke out between Mr. Martin, the defendants, members of the State's Law Revision Commission and other legislators.

11

(30) As time passed, it became obvious that Martin contract to serve as Executive Director, which expired in July 1988, would not be renewed.

(31) As such, in January of 1998, defendant announced its search for an individual to staff its CHRO's Executive Director's position.

(32) Defendants' announcement stated that the successful candidate must have at leave four years of "managerial experience" and six years of progressive civil rights enforcement experience. The announcement also provided that education could be substituted for specified amounts of experience.

(33) At the time of the announcement, Plaintiff possessed in excess of twenty-three (23) years of relevant experience. As a result of this experience, Plaintiff timely submitted an application for employment in the referenced position.

(34) Although, plaintiff was selected as one of the five finalists and best-qualified candidates, plaintiff's application was nonetheless rejected and Defendants notified plaintiff of this fact by letter dated February 1, 1999. No reason was given for the rejection.

(35) In March of 1999, at defendants' monthly commission meeting, it was made public that the commissioners had elected to offer the job to Mr. Herman Jones, the former Executive of the West Virginia commission.

(36) However, the commissioners elected not to go forward with their interim decision to hire Mr. Jones in light of articles that were printed in newspapers of general circulation throughout the state of Connecticut. These articles accused Mr. Jones of having frequently clashed with his West Virginia Commissioners and pondered the

wisdom in hiring a person who apparently possessed the same unpleasant characteristics that they found in Mr. Martin.

(37) During the course of the March 1999 commission meeting, the commissioners announced that they had voted to employ Cynthia Watts Elder to serve as the Commission's interim executive director, despite the fact that as Elder had not applied for the position nor otherwise expressed a formal interest in staffing it.

(38) Thereafter, in June of 1999, Watts Elder was summarily appointed to the commission's executive director's position.

(39) At the time of Elder's appointment, according to her resume, she possessed absolutely no experience whatsoever in civil rights enforcement and had never staffed a position where she planned and supervised the work of subordinate employees or where she was assigned primary responsibilities for overseeing the operations of a work unit or other entity. .

(40) In a nutshell, plaintiff contends that Elder did not meet the minimum qualifications for this position. In making this assertion, plaintiff does not intend to downplay defendant, Elder's educational training and her on the job experience. Rather, plaintiff states that Elder possessed knowledge, skills and experience in professional areas other than civil rights enforcement.

(41) Moreover, plaintiff contends that since he was rejected notwithstanding his superior qualifications to the chosen applicant, defendants excluded his application by subjecting him to discriminatory selection criteria and/or by selecting and preferring Elder due to discriminatory criteria.

(42) IN CONCLUSION, plaintiff states that defendants, acting collectively and

13

individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

### COUNT II Pre-Termination Retaliation
### Discriminatory Removal of Plaintiff
### From Defendants' Deputy Director Position

(43) Plaintiff adopts and incorporates herein each and every allegation contained in Count I of the Complaint.

(44) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following acts of disparate treatment retaliation-discrimination:

(45) Prior to Plaintiff's removal from defendants' Deputy Director for Enforcement position, defendant Elder was quoted in the August 25th, 1999 edition of the Journal Inquirer as having said that "Martin had a track record of bringing on individuals he either worked with or wanted to hire, and it was not an appropriate process. **Most were minorities**, so the other staff, **and particularly Caucasians**, saw all of these faces that may not have been brought on through the customary and open process ... ." Additionally, in an article published in the Hartford Courant on September 11, 1999, entitled "Firing Jolts Agency", Defendant Elder is quoted as having stated in her August 25th interview with the Journal Inquirer that "**Martin had created a climate of racial tension within the agency and exercised favoritism toward African American in his hiring and promoting.**"

(46) Upon learning of the Inquirer's article, a number of defendants' minority employees, including plaintiff, challenged the factual premises upon which the allegations were based.

14

(47) For the most part these challenges were communicated directly to defendants. As a result thereof, defendants elected to expedite the Plaintiff's removal due in part to Plaintiff's opposition to defendants' discriminatory conduct and due in part to defendants' desire to reduce its population of black employees in an effort to lessen the white employees perception of racial tension and discrimination in the agency. Black.

(48) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

## COUNT III, DENIAL OF RIGHT TO COMPETE
## FOR VACANT DIRECTOR OF FIELD OPERATIONS POSITION

(48) Plaintiff adopts and incorporates herein each and every allegation contained in Count I and Count II above.

(49) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following acts of disparate treatment arising out of defendants' refusal to allow plaintiff to compete for defendants' vacant Director of Field operations position in September 1999 and by summarily placing a white male employee, Donald Newton, in the position.

(50) These facts show that sometime prior to Thursday, September 9, 1999, defendants, acting through Elder, Appleton and Blackwell met for the purpose of planning plaintiff's removal from his deputy director of enforcement position and redistributing these functions to defendants' vacant Chief of Field Operations position.

(51) Also, during these meetings, defendants gave careful consideration to the fact that once plaintiff was removed from his Deputy Director for Enforcement position it

15

would be necessary for them to provide for the continual performance of the commission's Field Operations' oversight and supervisory responsibilities that plaintiff had been performing.

(52) Ultimately, to address these need defendants decided that they would redistribute these duties and responsibilities to one of the commission's white male regional manager's, Donald Newton. To do so, defendants elected to waive its competitive promotional process and to summarily place Newton into the commission's vacant Chief of Field Operations' position.

(53) Thereafter, on September 9th and 10th defendants implemented each of these decisions by first removing plaintiff from his Deputy Director for Enforcement position and by placing Newton into the commission's Chief of Field Operations position.

(54) Although, defendants have not given plaintiff a reason for not allowing him to compete for the vacant Chief of Field Operations position, defendants did offer an explanation to the EEOC in response to plaintiff's administrative complaint. There, defendants, acting through defendant Elder stated, "the position of Regional Manager was reclassified to the Chief of Field Operations position".

(55) In other words, defendants contend that plaintiff was not allowed an opportunity to compete for the vacancy because the Chief of Field Operations' position was not filled through the competitive examination process. Rather, Mr. Newton's Regional Manager's position was reclassified into the Chief of Field Operations' position. Hence, in essence, defendants contend that the reclassification decision eliminated the competitive nature of the promotional opportunity and the need to

16

administer an examination for purpose of determining the best-qualified employee/applicant.

(56) While plaintiff concedes defendants' right to eliminate the competitive nature of the promotional processes for this position through the use of defendants' reclassification policy; nonetheless, plaintiff contends that despite this authority, defendants may not utilize its reclassification policy for purpose of bringing about a race based discriminatory result, which they obviously did here.

(57) Hence, plaintiff contends that defendants' legitimate non-discriminatory reason must articulate facts sufficient to show that their decision reclassifying Newton's Regional Manager's position into the Chief of Field Operations' position was made in compliance with the requirements of the State's reclassification policies, (see Sections 5-200b and 5-227a, CGS).

(58) The facts show that no such consideration motivated defendants' decision to reclassify Newton's Regional Manager's position into the commission's Chief of Field Operations (CFO) position.

(59) First, this is so because contrary to the statutory requirements, Newton had never performed any of the duties of the CFO position.

(60). Second, Newton failed to meet the minimum qualification required to staff the CFO's position.

(61) The qualifications needed to perform the duties of the job are set out in the position's job specifications. It requires that an applicant possess "ten (10) years' of general experience in the enforcement of human rights legislation" and that at least two of the applicant's ten (10) years of general experience be **"IN A MANAGERIAL OR**

**SUPERVISORY CAPACITY OVER TECHNICAL OR PROFESSIONAL PERSONNEL AT OR ABOVE THE LEVEL OF HUMAN RIGHTS AND OPPORTUNITIES REGIONAL SUPERVISOR".**

(62) In this respect, Newton's failure to satisfy the two years special experience requirement. This is so because Newton did not possess "two years of supervisory experience over persons performing in the Regional Manager's position".

(63) Consequently, it's obvious that Newton failed to possess the qualifications needed to reclassify his position into the CFO position.

(63) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT IV, WRONGFULLY TERMINATION

(64) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, Count II and Count III above.

(65) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following conduct in violation of the State of Connecticut public policy against wrongful termination.

(66) These facts show that defendants' decision to terminate plaintiff's employment was made under circumstances that violate the State's Open Meetings Act, [See Section 1-21, CGS], and that in addition to terminating plaintiff's employment, defendants elected to do so in such a manner as would defame plaintiff's character and reputation and make it all but impossible for plaintiff to be able to find future employment

in his chosen profession.

(67) In this respect, the facts show that defendants planned plaintiff's termination in secrecy inasmuch as defendants made sure that plaintiff would not learn of their intent until after plaintiff's termination had been perfected.

(68) As such, plaintiff was not given notice of the fact that his termination had been placed on the Commission's agenda for consideration at its September 1999 meeting.

(69) Similarly, since the item was placed in the Executive Session portion of the agenda, it was not disclosed as an item in the published portion of the agenda.

(70) Moreover, since plaintiff was not given notice of the agenda item, plaintiff was deprived of an opportunity to exercise the statutory option of having the item addressed in Open Session as provided in Section 1-18a (2), CGS. In this respect, plaintiff states that this denial deprived him of a substantial right inasmuch as plaintiff's participation in the discussion could have altered the commission's outcome on the termination recommendation.

(71) This is so because pursuant to the Regulations of Connecticut State Agencies, the Executive Director's recommendation to hire or fire a deputy director is subject to the advice and consent of a majority vote of the commissioners.

(72) Further, these facts show even though defendants elected not to give plaintiff notice of their intent to terminate his employment, however, defendants did make arrangement to secure the professional services of a police officer for the sole purpose of constructively locking plaintiff out of his office, immediately upon the adjournment of the commission meeting and to forcibly, if necessary, escort plaintiff

from the building in which the commission's is housed and off the premise on which the building is located.

(73) In this respect, the facts show that immediately upon the adjournment of the commission meeting, Mr. Newton, in the company of a State Trooper, advised plaintiff that he must, (right, then and there), release the keys to his office and all commission property and that plaintiff would be escorted by the officer into plaintiff's office so that plaintiff could remove all personal items belonging to him.

(74) Plaintiff was told that he had to remove all his property instantly because the state trooper had been instructed to escort him out of the building and to prevent his return. The assigned officer advised plaintiff that he didn't know the rationale behind his instructions but that plaintiff had to take whatever property he could in his hands because he would not be allowed back into the building.

(75) Further, the officer explained that he could not let plaintiff out of his sight until plaintiff had exited the state property. As such, the media observed plaintiff being escorted off state property and reported this fact.

(76) As a consequence thereof, many of plaintiff acquaintances telephoned him to express their sadness about his being arrested. Moreover, classmates of plaintiff's grade school children asked them why their father was arrested.

(77) Plaintiff states that the sole purpose of this conduct was to defame plaintiff's character and reputation so as to create the image that plaintiff was a militant and violent black employee and to instill fear and consternation in the minds of all future employers with whom plaintiff might seek employment.

(78) Plaintiff states that to this extent defendants' plan, scheme and design have been one hundred percent perfect because it has frightened off all potential future employers and as a consequent thereof it has subjected plaintiff to the intentional infliction of emotion distress.

(79) Consequently, Plaintiff suffered various forms of injuries, including severe forms of mental and emotional distress and depression arising out of his wrongful termination and caused as a direct and proximate consequence of the Defendants' illegal conduct.

## COUNT V – DEFAMATION

(80) Plaintiff adopts and incorporates herein each and every allegation contained in Count I, II, III and IV above.

(81) In addition to the illegal conduct described above, Plaintiff was subjected to the following acts of defamation in violation of the laws of the State of Connecticut.

(82) As set forth hereinabove, defendant Elder was appointed to the position of Acting Executive Director of the Commission on Human Rights and Opportunities in March of 1999.

(83) As of defendant Elder's first day on the job, (on or about March 12, 1999) plaintiff commenced his first day of sick leave that lasted roughly two weeks.

(84) Thereafter, upon plaintiff's return to work he learned that defendant Elder had met with a number of CHRO's employees and had informed them that she had determined that plaintiff was not performing the duties and responsibilities of his job in a competent and proficient manner and based on these facts, that she had concluded that

plaintiff was not qualified to perform the duties and responsibilities of the Deputy Director for Enforcement's position.

(85) Additionally, defendant Elder advised these employees that she would be taking corrective action to reign in plaintiff's incompetence

(86) About the same time, Elder scheduled her first staff meeting with plaintiff. During this meet, Elder stated on several occasions that she had learned of plaintiff's incompetent performance and felt compelled to take urgent and immediate corrective action.

(87) Thereupon, plaintiff advised Elder that he vigorously disagreed with her contention and informed her that, by and large, plaintiff's performance of his duties and responsibilities had been pretty much reduced to instructions contained in several Compliance and Procedures Manuals that he had authored, in conjunction with various co-workers.

(88) Elder acknowledged having seemed these publications and represented that they chronicled plaintiff's incompetent performance. Thereupon, she instructed plaintiff to forthwith issue a memorandum directive to the Field Operation staff advising them to discontinue use of any and all materials that had been issued out of plaintiff's office.

(89) These directives were issued in accordance with plaintiff's instructions, despite defendant's refusal to identify any specific errors contained in these publications. Elder's only response to plaintiff's request was that she had talked to members of the commission's legal staff and was convinced that the publications were full of incorrect and damaging information.

(90) Thereafter in meetings with Elder, she repeated her instructions to plaintiff to discontinue all performance related contacts with the commission's Field Operation staff. Specifically, prior to Elder coming on board, plaintiff had assembled a team of staff attorneys and investigators to review and draft "Field Operation Interpretative Guidelines", (FOIGs), which instructed staff in how to investigate various types of discrimination complaints. Plaintiff was immediately removed from the committee and his Field Operation functions were turned over to one or more persons on the commission's General Counsel staff. Insofar as plaintiff can recall, these instructions were issued directly by Elder.

(91) Simultaneously, plaintiff was specifically ordered to cease and desist all contacts with the Field Operation staff, specifically including any and all plans to recommence staff training for reason that, in her judgment, it would be best for staff to receive no training whatsoever than for them to continue to be the victims of plaintiff's incompetent training.

(92) Thereupon, plaintiff once again inquired as to the source of Elder's allegations. In this respect, plaintiff explained that while, on the one hand, he has recognized her authority to revamp the commission's processes as she deemed appropriate, nonetheless, plaintiff made it clear that this authority did not carry with it a license to defame plaintiff's reputation.

(93) Plaintiff noted that he had patiently asked for some form of documentation in support of her allegations, but that she had steadfastly refused to identify any specifics. Plaintiff reminded Elder that her sole basis up to that point had been the assertion that she had talked to staff attorneys within the commission's Counsel Office.

(94) Plaintiff noted that months had elapsed since he first asked her to identify a specific instance of conduct to support her contention. Plaintiff then advised defendant that he thought it would be reasonable for her to discontinue her assertions, until she came forward with at least an arguable example of her contentions, especially since plaintiff has issued several Manuals. Indeed, plaintiff reasoned that in light of Elder's contentions, and the volumes of materials that plaintiff had published, that there shouldn't be any barriers to her being able to offer one single example.

(95) Thereafter, in response to this conversation, Elder stated that the principal source of her information was a white female staff attorney named Joan Parker. Thereupon, Elder identified, as an example of plaintiff's incompetence, an instructional memo, issued by plaintiff, addressing how to investigate sexual harassment complaints.

(96) Plaintiff, then, reviewed the document's contents with Elder for purpose of proving the correctness of the instructions. However, notwithstanding these activities, Elder repeated her belief that plaintiff was incompetent because various white employees had allegedly told her that he was. Elder totally refused to entertain the idea that the plaintiff and the courts could be right and the staff attorney wrong. As such, she frequently republished her defamatory statements.

(97) On another occasion, Elder summoned plaintiff to her office and advised him that she had been in contact with Mike Aggress, a white male staff attorney assigned to the Commission's Bridgeport Regional Office, and wanted plaintiff to get with him for instructions in how to investigate complaints alleging disability discrimination because she had commenced reading a Field Operation Interpretative Guideline (FOIG) that

Aggress had written and she was truly amazed and impressed with the thoroughness and competency with which the document was drafted.

(98) Plaintiff advised Elder that he was not aware of any such document authored by Mike Aggress and asked for the privilege of seeing said document. Thereupon, she admonished plaintiff that she found his response totally unacceptable inasmuch as plaintiff had been with the commission for years and she had just come on board. She asked plaintiff to offer her an explanation as to why he had not been able to obtain this document during plaintiff's tenure with the commission in light of the fact that she had been able to ascertain it within the scope of her brief tenure with the commission.

(99) Elder then produced the document of which she spoke. Thereupon, Plaintiff advised her that plaintiff had authored the document and that the white male employee whom she attributed it to had had nothing, whatsoever, to do with it production. Upon learning this, Elder was shocked and, after a brief interval, told plaintiff that she was not aware of his contention but would check it out and would issue instructions to discontinue its use if it were determined that the document had, in fact, been drafted by him.

(100) These statements were frequently published to third parties who had no legitimate need to receive the information.

(101) Each of these defamatory statements were false and, at the time Elder made them, she either knew them to be false and/or otherwise acted with a malicious and reckless disregard as to their truthfulness.