## IN THE UNITED STATED DISTRICT COURT
### DISTRICT OF CONNECTICUT



| | |
|---|---|
| Jewel E. Brown, | ) |
| Plaintiff, | ) |
| | ) |
| VS          #3:02CV223(CFD) | ) |
| | ) |
| The state of Connecticut and its Commission On Human Rights | ) |
| and Opportunities, the honorable, Nicholas Cioffi, Chair person | ) |
| CHRO, the honorable Richard Robinson, Commissioner and | ) |
| Chair person, CHRO, the honorable Vivien Blackford, | ) |
| Commissioner, CHRO, Cynthia Watts Elders, Executive Director, | ) |
| CHRO, and Lee Ann Appleton, Business Manager, CHRO; | ) |
| the Office of Policy and Management and its' Secretary | ) |
| Mark Ryan; Barbara Waters, Commissioner, Department of | ) |
| Administration Services; | ) |
| **DEFENDANTS** | ) |
| | ) February 10, 2005 |

### PLAINTIFF'S SECOND SUBSTITUTED COMPLAINT, AS AMENDED

Comes now Plaintiff, Jewel E. Brown, and in support of this Second Amended

and Substituted Complaint against the defendants, individually and collectively, alleges

and states, as follows:

### SECTION I: SCOPE OF AMENDMENT

That subject to this Court entering his order granting Plaintiff's accompanying

Motion filed pursuant to Rule 41(a), Federal Rules of Civil Procedures, to voluntary

dismiss, without prejudice, the Parties and Counts set out in said Motion, Plaintiff

hereby amend his complaint as hereinafter set out:

### SECTION II: JURISDICTION

This is a suit at law and in equity authorized and instituted pursuant to First and

Fourteenth Amendments of the United States Constitution, Sections 3, 4, 14 and 20 of

the Constitution of the State of Connecticut, 42 USC § 2000e-5 et seq, as amended; 42

USC § 1981, as amended; 42 USC 1983, Section 46a-60 et seq, and Section 31-51q of the Connecticut General Statutes. All conditions precedent to jurisdiction under 42 USC § 2000e-(f)) (3) have occurred or will occur as prescribed by law.

This court's jurisdiction is invoked pursuant 28 USC § 1343, 28 USC § 1344, 28 USC § 2201 and 28 USC § 2202 providing for the equal rights of every person in every state and territory in the United States.

Also, plaintiff invokes the court's pendent jurisdiction over discriminatory practices and freedom of speech and association claims arising under the Connecticut's Discriminatory Practices Act and Section 31-51q of the Connecticut General Statutes.

Plaintiff seeks to secure the protection of and redress the deprivation of rights secured and protected by the constitution and laws of the United States and the State of Connecticut which provides for injunctive, both temporary and permanent, relief and for monetary compensation for victims of racial and gender based discrimination and similar relief for the deprivation of an individual's rights of freedom of speech, association and the equal protection of the laws, among others.

## SECTION III - THE PARTIES

(1) Plaintiff, a fifty four (54) year old black male, is a citizen of the United States, residing in the state of Connecticut and in the town of South Windsor at 21 Brewster Road.

(2) Defendant, State of Connecticut, a body politic, is the governing body of the State organized and existing pursuant to the constitution and laws of the United States and the State of Connecticut.

2

(3) Defendants, Commission on Human Rights and Opportunities, Office of Policy and Management and the Department of Administrative Services are political subdivisions of the State of Connecticut, organized and existing pursuant to the laws of the State. Each subdivision is a component part of the executive branch of state government.

(4) Defendants, Mark Ryan and Barbara Waters are the current and/or former duly appointed Secretary of the Office of Policy and Management and Commissioner of the State Department of Administrative Service, respectively, and as such possessed joint statutory authority for the enforcement of certain aspects of the State Personnel Act and at all times pertinent hereto have either caused, permitted and/or acquiesced in the commission of numerous violations of the Act that defendants knew would, and intended to, subject plaintiff to the various types of discriminatory injuries of which plaintiff complains herein.

(5) Defendants, Leeann Appleton and Cynthia Watts Elder are the former Business Manager and Executive Director of the Commission on Human Rights and Opportunities and at all times pertinent hereto exercised the powers of their offices in such a manner as to intentionally subject plaintiff to illegal discriminatory injuries.

(10) Defendants, Vivian Blackford, Nicholas Cioffi, and Richard Robinson are former commissioners of the commission On Human Rights and Opportunities and at all times pertinent hereto exercised appointing authority over one or more of the positions for which plaintiff applied and exercised this authority in such a manner as to intentionally subject plaintiff to illegal discrimination.

(11) Each defendant is being sued in both his/her individual and representative capacities and each defendant, during all times pertinent hereto, acted pursuant to and under color of the laws of the United States and the State of Connecticut.

### COUNT I -REJECTION OF PLAINTIFF'S EXECUTIVE DIRECTOR APPLICATION

The following facts are illustrative of the disparate treatment discrimination to which plaintiff was subjected:

(1) Unless otherwise expressly set out, as used herein, the term defendants shall be used in its plural and singular form and shall refers to those named defendants who either served as CHRO commissioners and/or CHRO employees.

(2) Defendants employed plaintiff on or about the 15th day of August 1991 in their Deputy Director for Enforcement position and except for the period of time commencing mid July 1998 through mid March 1999, plaintiff retained this position until his employment was severed on or about the 11th day of September 1999. During the July 1998 through March 1999 period, Plaintiff served as the Acting Executive Director of Defendants' Commission on Human Rights and Opportunities.

(3) Plaintiff was employed by the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, pursuant to a recommendation of Mr. Louis Martin, whom the Commission employed as its Executive Director in January 1991.

(4) As the Commission's Deputy Director for Enforcement, Plaintiff was assigned the general duty and responsibility of overseeing the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.) Specifically, plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint investigation

4

activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

(5) Throughout Plaintiff's employment, Plaintiff performed the duties and responsibilities of his job without complaint, criticism, and/or incident. Notwithstanding, a number of the Commission's employees; especially its white employees, commenced to allege that they were being subjected to illegal race based discrimination by the Commission's Executive Director, Louis Martin and various other members of its managerial staff. As a result of these allegations, various lawsuits were filed by the Commission's white employees against Martin, Valerie Caldwell Gaines, and Femi Assegai, the latter two of whom were, at the time, serving as Manager of, and an Investigator assigned to, the Capitol Region Office in the Commission's Field Operations Division.

(6) The following acts are illustrative of the conduct, that Martin engaged that the commission's white employees deemed discriminatory. These acts commenced in January 1992 when Martin employed Valerie Caldwell Gaines, and Femi Assegai, both black employees.

(7) At the time of their hire and placement, only one black employee was assigned to the commission's Capitol Region Office which employed roughly fifteen (15) employees;

(8) Shortly after the employment of these individuals, tension commenced to develop among and between the commission's white and black employees assigned to the Capitol Region Office.

(9) Thereafter, the Executive Director, at the direction and knowledge of the Commissioners launched a thorough investigation into the cause(s) and sources of the disturbances.

(10) A three-member committee of management personnel investigated the allegations and, ultimately, no determinations of culpability and/or liability were made.

(11) Thereafter, when Martin elected to promote Mrs. Gaines to the position of Manager, the Office's white employees became more and more convinced that Mr. Martin and Gaines were conspiring to subject them to illegal race based discrimination. Throughout this time-period, plaintiff visited frequently with Martin so that Plaintiff could fully understand the motivation for his decisions and was satisfied that they were not race based; even though Plaintiff ultimately disagreed with him as to some of the decisions that he made.

(12) Throughout this time period, plaintiff made it a practice to conference with all commission's employees who deemed themselves victims of Martin's decisions so that they would at least have the benefit of Plaintiff analysis and, when appropriate, plaintiff would also share with them plaintiff's commitment to assist in their efforts to gain upward mobility in the Agency. Again, plaintiff deemed it extremely important to assure each employee that she/he would receive non-discriminatory treatment and, to the extent reasonable minds could agree, that they would also receive fair and equitable treatment.

(13) Despite these efforts, events continued to occur that white employees and white elected officials deemed to be manifestations of Martin's racist proclivities toward white persons.

(14) In April 1996, the Connecticut Supreme Court issued its decision in the case of Angelsea vs. CHRO where it held, that the Commission's statutory scheme mandated that it complete its investigation to all complaints filed with it within a period of nine (9) months from the date of filing.

(15) Inasmuch as the potential consequences of this decision were substantial, the decision was widely covered by the state's media. In covering the same, the media commenced to accord substantial coverage to statements made by Martin that the media deemed to suggest racial overtones.

(16) As such, a public frenzy developed surrounding Martin and what was perceived as his racist attitude white persons in general and white employees in particular.

(17) Simultaneously, at the request of Commission officials, the state legislature and governor passed Public Act 96-241. It contained several provisions that were intended to abate the adverse impact that the Angelsea decision would have otherwise had on those adversely affected by it. For example, it stayed the dismissal effect that the decision would have had on roughly a thousand complainants whose complaints would have been dismissed due to CHRO having failed to have completed its investigation into their complaints within a period of nine (9) months from the date their complaints were filed.

(18) The Act contained additional provisions that proved to be the source of great dissension. These provisions provided that the governor and various legislative office holders would appoint members to a task force to study the Commission's

complaint processes. The Task Force was to make its report to the Law Revision Commission, an arm of the state legislature.

(19) Upon learning of the Task Force, its mission and reporting responsibilities, Martin became convinced that its purpose was to undermine the accomplishments of his administration by producing a report purporting to confirm repeated publicly allegations that he and his managerial staff were both "racist and incompetent" and that these characteristics had resulted in his "administration's failure to remedy the agency's gross inability to competently implement and carry out the statutory purposes for which the agency was created".

(20) Consequently, Martin vowed not to cooperate with the ask Force nor the Legislation Revision Commission and communicated his decision to the Agency's commissioners; Governor Rowland, his chiefs of staff; the Secretary of the Office of Policy and Management and to the General Counsel of the Office of Policy and Management who now serves as the Chairperson of the CHRO.

(21) Similarly, throughout this period, plaintiff made his disagreement with Mr. Martin known. Plaintiff's opposition was manifested in various ways, including direct oral and written communication from plaintiff to Martin, commissioners and elected officials.

(22) Additionally, plaintiff sought and was granted permission from Martin to attend the Task Force's meetings as a resource person and, in this role, to provide the Task Force with whatever assistance plaintiff could – subject to Mr. Martin's permission.

(23) Notwithstanding plaintiff's well publicized disagreement with Martin's decisions that were perceived as being discriminatory, plaintiff was deemed and labeled a racist too solely because he is black and solely because defendants imputed Martin's

perceived racist attitude to all of its black employees. This defendants did notwithstanding the fact that NO White EMPLOYEE EVER ACCUSED plaintiff OF DISCRIMINATING AGAINST HIM/HER OR FILED A FORMAL COMPLAINT AGAINST plaintiff ALLEGING DISCRIMINATION.

(24) In other words, instead of defendants making an independent determination as to whether or not plaintiff had engaged conduct that subjected defendants' white employees to prohibited race based discrimination, defendants elected to impute Martin's perceived racist attitude to plaintiff solely because both plaintiff and Martin are black.

(25) To illustrate this point, during to course of the public frenzy concerning Martin's perceived racist attitude, he was accused of engaging numerous of other acts, some illegal and other incompetent, that according to defendants and state officials "rendered the Commission out of control and dysfunctional."

(26) These acts ran the gambit from maintaining and operating a private business on state time and under such terms and conditions as violated the State's Ethic laws and failing to properly inventory and maintain control over thousands of dollars in state personal property that had been assigned to the commission and, as such, was under his control.

(27) To ascertain the extent of these violation the Attorney General and state offices launched investigations into the conduct of most all of the commission's managerial personnel. Ultimately, as a result of these investigations, it was determined that several of the commission's white employees had, in conjunction with Martin, engaged the illegal and incompetent conduct.

9

(28) Notwithstanding these determinations, defendants absorbed the commission's white employees of all liability and even agreed to pay a thousand ($1,000) dollars fine imposed a one of its white employees by the Ethic Commission for having violated its laws due to the fact that these employees had been duped by Martin. No black employee was treated similarly. As a matter of fact, defendants terminated each and every black employee who was even accused of wrongdoing whether or not the allegations were proven.

(29) Moreover, the undisputed facts show that plaintiff was neither a racist nor incompetent. Specifically, in addition to the fact that no white employee ever accused plaintiff of subjecting him/her to illegal discrimination, these facts also showed that the Field Operation Unit was superbly managed during this period. For example, under plaintiff's leadership the Unit either remedied, or at a minimum, implemented corrective measures capable of remedying its enforcement deficiencies. Specifically, under Plaintiff's leadership the commission a backlog of in excess of three thousand (3000) complaints was eliminated in the Field Operation Unit and a backlog of in excess of two hundred fifty (250) complaints in the public hearings Unit was eliminated.

(30) As a result of the aforementioned environment, it became obvious that Martin's contract to serve as Executive Director, which expired in July 1988, would not be renewed.

(31) As such, in January of 1998, defendant announced its search for an individual to staff its CHRO's Executive Director's position.

(32) Defendants' announcement stated that the successful candidate must have at leave four years of "managerial experience" and six years of progressive civil rights

enforcement experience. The announcement also provided that education could be substituted for specified amounts of experience.

(33) At the time of the announcement, Plaintiff possessed in excess of twenty-three (23) years of relevant experience. As a result of this experience, Plaintiff timely submitted an application for employment in the referenced position.

(34) Although, plaintiff was selected as one of the five finalists and best-qualified candidates, plaintiff's application was nonetheless rejected and Defendants notified plaintiff of this fact by letter dated February 1, 1999. No reason was given for the rejection.

(35) In March of 1999, at defendants' monthly commission meeting, it was made public that the commissioners had elected to offer the job to one Herman Jones, the former Executive of the West Virginia commission.

(36) However, the commissioners elected not to go forward with their interim decision to hire Mr. Jones in light of articles that were printed in newspapers of general circulation throughout the state of Connecticut. These articles accused Mr. Jones of having frequently clashed with his West Virginia Commissioners and pondered the wisdom in hiring a person who apparently possessed the same unpleasant characteristics that they found in Mr. Martin.

(37) During the course of the March 1999 commission meeting, the commissioners announced that they had voted to employ Cynthia Watts Elder to serve as the Commission's interim executive director, despite the fact that as Elder had not applied for the position nor otherwise expressed a formal interest in staffing it.

11

(38) Thereafter, in June of 1999, Watts Elder was summarily appointed to the commission's executive director's position.

(39) At the time of Elder's appointment, according to her resume, she possessed absolutely no experience whatsoever in civil rights enforcement and had never staffed a position where she planned and supervised the work of subordinate employees or where she was assigned primary responsibilities for overseeing the operations of a work unit or other entity. .

(40) Moreover, plaintiff contends that since he was rejected notwithstanding his superior qualifications to the chosen applicant, defendants excluded his application by subjecting him to discriminatory selection criteria and/or by selecting and preferring Elder due to discriminatory criteria.

(41) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, elected to reject his application despite his superior qualifications and due solely to the fact that he was a black employee in Martin's administration and that simultaneously defendants elected to select Watt-Elder because she is female and black and due to defendants' hope that by selecting a less qualified black employee defendants could successfully defend themselves against any subsequent lawsuit that the plaintiff might commence. As such, plaintiff is entitled to such relief as provided by law or in equity.

## COUNT II:  RETALIATORY REMOVAL OF PLAINTIFF FROM DEPUTY DIRECTOR POSITION

(42) Plaintiff adopts and incorporates herein each and every allegation contained in Count One of the Complaint.

(43) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following acts of disparate treatment retaliation-discrimination:

(44) Prior to Plaintiff's removal from defendants' Deputy Director for Enforcement position, defendant Elder was quoted in the August 25th, 1999 edition of the Journal Inquirer as having said that "Martin had a track record of bringing on individuals he either worked with or wanted to hire, and it was not an appropriate process. **Most were minorities, so the other staff, and particularly Caucasians, saw all of these faces that may not have been brought on through the customary and open process ... ."** Additionally, in an article published in the Hartford Courant on September 11, 1999, entitled "Firing Jolts Agency", Defendant Elder is quoted as having stated in her August 25th interview with the Journal Inquirer that "**Martin had created a climate of racial tension within the agency and exercised favoritism toward African American in his hiring and promoting.**"

(45) Upon learning of the Inquirer's article, a number of defendants' minority employees, including plaintiff, challenged the factual premises upon which the allegations were based. For the most part these challenges were communicated directly to defendant Elder.

(46) As a result thereof, defendants, acting in conjunction with defendant Elder, elected to remove Plaintiff from his deputy director's position due, in part, to Plaintiff's opposition to defendant Elder's discriminatory remarks and due in part to defendants' desire to reduce its population of black employees in an effort to lessen the white employees perception of racial tension and discrimination in the agency.

13

(47) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

## COUNT III: DENIAL OF RIGHT TO COMPETE
## FOR VACANT DIRECTOR OF FIELD OPERATIONS POSITION

(48) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One and Two above.

(49) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following acts of discrimination arising out of defendants' refusal to allow plaintiff to compete for defendants' vacant Director of Field operations position in September 1999 and by summarily placing a white male employee, Donald Newton, in the position.

(50) These facts show that sometime prior to Thursday, September 9, 1999, defendants, acting through Elder, Appleton and Blackwell met for the purpose of planning plaintiff's removal from his deputy director of enforcement position and the staffing of defendants' vacant Chief of Field Operations position.

(51) During these meetings, and in furtherance of defendants' desire to preclude plaintiff from having an opportunity to compete for this position, defendants elected to summarily promote Donald Newton, white male, employee into the position. In doing so, defendants were motivated by their desire to terminate and/or preclude the employment of all black managerial employees in the Martin administration.

(52) Although, defendants have not given plaintiff a 'formal' reason for not allowing him to compete for the vacant position, defendants did offer an explanation to the EEOC in response to plaintiff's administrative complaint. There, defendants, acting

14

through defendant Elder stated, "the position of Regional Manager was reclassified to the Chief of Field Operations position".

(53) Plaintiff states that this reason is false because Newton failed to satisfy the state's reclassification requirements inasmuch as he neither possessed the supervisory experience nor was he performing the duties and responsibilities of the job, as required by statute, at the time of the alleged reclassification decision.

(54) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT IV: WRONGFULLY TERMINATION

(55) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Three above.

(56) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following conduct in violation of the State of Connecticut public policy against wrongful termination.

(57) These facts show that in addition to terminating plaintiff's employment, defendants did so under circumstances that: (a) violated the State's Opening Meeting Act, [See Section 1-21, CGS]; and (b) defamed plaintiff's character and reputation, thereby making it all but impossible for plaintiff to find future employment in his chosen profession.

(58) In this respect, the facts show that defendants planned plaintiff's termination in secrecy so that plaintiff would not learn of their intent until after plaintiff's termination

15

had been perfected.

(59) Consequently, plaintiff was deprived of a twofold statutory opportunity. These were: (a) plaintiff right to have the issue pertaining to the termination of his employment addressed in an "opened" as opposed to a "closed" session of the commission's meeting; and (b) plaintiff right to be present and participate in the both the opened and closed sessions, during the commission's deliberations pertaining to his employment. (See Section 1-18a (2), CGS)

(60) In this respect, plaintiff states that this denial deprived him of a substantial right inasmuch as plaintiff's participation in the discussion could have altered the outcome of the commission's deliberations.

(61) This is so because pursuant to the Regulations of Connecticut State Agencies, the Executive Director's recommendation to hire or fire a deputy director is subject to the advice and consent of a majority vote of the commissioners.

(62) Similarly, the facts reveal that plaintiff was terminated under circumstances that defamed plaintiff's reputation and character.

(63) Here the pertinent facts show that defendants' Elder, Appleton and Blackford conspired and designed a scheme whereby plaintiff would be removed from his office under such circumstances as would convey to the public that plaintiff was being removed as part of the new management strategy to clean house, that is, to rid the commission of all racist, incompetent and violent employees.

(64) In this respect, the facts show that immediately upon the adjournment of the commission meeting, Mr. Newton, in the company of a State Trooper, advised plaintiff that he must, (right, then and there), release the keys to his Office and all commission

16

property and that plaintiff would be escorted by the officer into plaintiff's office so that plaintiff could remove all personal items belonging to him.

(65) Further, the State Trooper explained that he could not let plaintiff out of his sight until plaintiff had exited the state property. As such, the media observed plaintiff being escorted off state property and reported this fact.

(66) As a consequence thereof, many of plaintiff acquaintances telephoned him to express their sadness about his being arrested. Moreover, classmates of plaintiff's grade school children asked them why their father was arrested.

(67) Consequently, Plaintiff suffered various forms of injuries, including severe forms of mental and emotional distress and depression arising out of his wrongful termination and caused as a direct and proximate consequence of the Defendants' illegal conduct.

## COUNT V – DEFAMATION

(68) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Four above.

(69) In addition to the illegal conduct described above, Plaintiff was subjected to the following acts of defamation in violation of the laws of the State of Connecticut.

(70) As set forth hereinabove, defendant Elder was appointed to the position of Acting Executive Director of the Commission on Human Rights and Opportunities in March of 1999.

(71) As of defendant Elder's first day on the job, (on or about March 12, 1999) plaintiff commenced his first day of sick leave that lasted roughly two weeks.

17

(72) Thereafter, upon plaintiff's return to work he learned that defendant Elder had met with a number of CHRO's employees and had informed them that she had determined that plaintiff was not performing the duties and responsibilities of his job in a competent and proficient manner and based on these facts, that she had concluded that plaintiff was not qualified to perform the duties and responsibilities of the Deputy Director for Enforcement's position.

(73) Additionally, defendant Elder advised these employees that she would be taking corrective action to reign in plaintiff's incompetence.

(74) About the same time, Elder scheduled her first staff meeting with plaintiff. During this meet, Elder stated on several occasions that she had learned of plaintiff's incompetent performance and felt compelled to take urgent and immediate corrective action.

(75) Thereupon, plaintiff advised Elder that he vigorously disagreed with her contention and informed her that, by and large, plaintiff's performance of his duties and responsibilities had been pretty much reduced to instructions contained in several Compliance and Procedures Manuals that he had authored, in conjunction with various co-workers.

(76) Elder acknowledged having seemed these publications and represented that they chronicled plaintiff's incompetent performance. Thereupon, she instructed plaintiff to forthwith issue a memorandum directive to the Field Operation staff advising them to discontinue use of any and all materials that had been issued out of plaintiff's office.

(77) These directives were issued in accordance with plaintiff's instructions, despite defendant's refusal to identify any specific errors contained in these

18

publications. Elder's only response to plaintiff's request was that she had talked to members of the commission's legal staff and was convinced that the publications were full of incorrect and damaging information.

(78) Thereafter, Elder identified the principal source of her information as being a white female staff attorney named Joan Parker.

(79) On another occasion, Elder summoned plaintiff to her office and advised him that she had been in contact with Mike Aggress, a white male staff attorney assigned to the Commission's Bridgeport Regional Office, and wanted plaintiff to get with him for instructions in how to investigate complaints alleging disability discrimination because she had commenced reading a Field Operation Interpretative Guideline (FOIG) that Aggress had written and she was truly amazed and impressed with the thoroughness and competency with which the document was drafted.

(80) Plaintiff advised Elder that he was not aware of any such document authored by Mike Aggress and asked for the privilege of seeing said document.  Upon Elder producing it, Plaintiff advised her that he had authored it and that the white male employee whom she attributed it to had had nothing, whatsoever, to do with it production.

(81) Upon learning this, Elder was shocked and, after composing herself, looked plaintiff in the eyes and stated "if this proves to be true, I will direct you to order the discontinuation of its use immediately".

(82) These statements were frequently published to third parties who had no legitimate need to receive the information.

19

(83) Each of these defamatory statements were false and, at the time Elder made them, she either knew them to be false and/or otherwise acted with a malicious and reckless disregard as to their truthfulness.

(84) Moreover, Defendants waived any qualified privilege to which the statements may have otherwise enjoyed inasmuch as defendants acted maliciously and with a reckless disregard for the truthfulness of the statements.

(85) In addition to the aforementioned conduct, plaintiff was subjected to a second act of defamation arising out of the manner in which plaintiff's employment was severed and the treatment accorded him in connection therewith.

(86) Specifically, the facts descriptive of this conduct are set out above in paragraphs 63 through 67.

(87) Additionally it was part and parcel of defendants' Elder, Appleton and Blackford scheme to create an environment that would convey to the public that plaintiff was being removed as part of the new management strategy to clean house, that is, to rid the commission of all racist, incompetent and violent employees.

(88) In an effort to convey this message to the public, defendants Elder, Appleton and Blackford secretly planned plaintiff's removal and secretly arranged to  have a member of the State's Department of Public Safety to be present for purposes of restraining plaintiff's mobility and to escort plaintiff from the premises.

(89) As such, the media observed plaintiff being escorted off state property and reported this fact.

(90) Plaintiff states that the only reason he was treated in this manner was defendants' desire to convey to the public that, like Martin, plaintiff, too, was an

20

incompetent, hostile and violent black racist. Moreover, defendants opted to use the state trooper because the media had earlier widely publicized the fact that Martin was locked from his office and advised that if he attempted to re-enter the same, that he would be arrested for trespassing. Hence, defendants sought to convey to the public that plaintiff was being treated identical to the manner in which Martin had been treated because plaintiff possessed the same alleged reprehensible characteristics that Martin possessed.

(91) As a consequence thereof, many of plaintiff acquaintances telephoned him to express their sadness about his being arrested. Moreover, classmates of plaintiff's grade school children asked them why their father was arrested.

(92) Moreover, plaintiff states that the sole purpose of this conduct was to defame plaintiff's character and reputation and to instill fear and consternation in the minds of all future employers with whom plaintiff might seek employment.

(93) Consequently, Plaintiff suffered various forms of injuries including, but not limited to, severe forms of mental and emotional distress and depression arising out of the defamatory conduct to which he was subjected which conduct was designed to and had the effect of, defaming plaintiff character and as such has, in reality, caused plaintiff to be unable to find gainful employment in plaintiff's chosen profession.

## COUNTS (VI) AND VII
### DISCRIMINATORY REMOVAL FROM
### ACTING EXECUTIVE DIRECTOR'S POSITION AND
### INTENTIONAL INFLICTION OF EMOTIONAL DISSTRESS

(94) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Five above.

21

(95) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was subjected to the following acts of discrimination and the intentional inflectional of emotional distress with respect to the reasons that motivated his removal from the Acting Executive Director.  .

(96) In this respect, the facts show that defendants Blackford and Appleton were motivated by their desire to prevent plaintiff from terminating the employment of defendant Appleton and to extract revenge against for his having made a decision, during the period plaintiff served as the Acting Executive Director of the Commission, to place defendant Appleton on administrative leave and to threaten her with disciplinary action.

(97) These facts show that as a result of conduct that Appleton engaged between the period of July 1997 and March 1998 that plaintiff deemed to be both insubordinate and incompetent, that plaintiff made a decision to place Appleton on administrative leave which subjected her to disciplinary action up to and including termination.

(98) Upon being placed on administrative leave, Appleton advised plaintiff that she had been told by both commissioners Blackford and Robinson that plaintiff didn't have the authority to either supervise or discipline her.

(99) In an effort to illustrate plaintiff's lack of authority, defendant Appleton inscribed her insubordinate attitude in a notation that she wrote on the bottom of the notice placing her on leave. There she wrote: "If the commissioners do not approve this action I will return to work on Monday February 22, 1999".

(100) Traditionally, and by statute, the executive director has sole authority to hire and fire all staff personnel except for the commission's general counsel and its two deputy directors, [See CGS §46a-52 (c) –(e)].

(101) Thereafter plaintiff was required to meet with two members of the Commission's Administrative and Personnel committee, for the purpose of, among other things, explaining the basis-underlying plaintiff's decision and to advise them of plaintiff's proposed future course of action. Defendant Blackford notified plaintiff of the meeting and explained that she would not be able to attend.

(102) Thereafter, plaintiff met with Commissioners Robinson and Williams (both black males) and set forth the facts as plaintiff saw them. Plaintiff assured them that he did not intend to fire LeeAnn and that, to the contrary, he desired only to extract from her a commitment to unyieldingly follow plaintiff's instructions.

(103) Given this understanding, a course of activities were agreed upon that would result in LeeAnn being returned to work and the convening of a fact-finding hearing for purpose of clarifying LeeAnn's role.

(104) However, the day after plaintiff notified LeeAnn that she was to return to work, plaintiff received a telephonic message from Commissioner Blackford wherein she advised plaintiff that effective immediately LeeAnn would no longer report to plaintiff and that plaintiff was to have no further contact with her regarding any commission matter and that during this time period LeeAnn would have sole authority to handle all budgetary and personnel matters.

(105) Thereafter, plaintiff learned that defendants, acting in conjunction with defendant Ryan and Waters had met on numerous occasion during the period in which

23

defendant Blackford were purporting to be working out a solution with plaintiff pertaining to Appleton and that the sole purpose of these meetings were to give defendants Ryan and Waters sufficient time to identify some black person in state government that they could put in charge of the commission who would consent to Appleton having exclusive jurisdiction over all of the commission's personnel and budgetary matters.  n

(106)  In this respect, Elder explained that the commissioners actively solicited her for the position. Specifically, according to Elder, she was called out of a meeting and instantaneously offered the position and was told that she had to make up her right then and there (on the spot).

(107)Hence, plaintiff states that as direct and proximate consequence of the facts setout above, defendants made their decisions to terminate plaintiff's Acting Executive Director's appointment and to appoint Elders to the Acting Executive Director's position.

(108) Hence, plaintiff submits that the sole reason for defendants' recruiting Elder for the position was to shield defendant Appleton from having to submit, any longer, to the pretense of plaintiff's supervisory authority.

(109) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

## COUNT VIII, DISCRIMINATION WITHIN THE TERMS AND CONDITIONS OF COMPENSATION

(110) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Seven above.

(111) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was subjected to the following acts of discrimination within the terms and conditions of plaintiff's compensation.

. (112) Specifically, these facts show that in October 1998, following plaintiff's Acting Executive Director appointment in July 1998, plaintiff requested the Commissioners to appoint Cheryl Sharpe, a black female, to serve in the Acting Deputy Director For Enforcement position and to increase plaintiff's and Sharpe's compensation in according with state policy for performing duties in a higher classification.

(113) Thereafter, during the next four months, the issue of appropriate compensation was placed on the agenda of each commission meeting. During these meetings defendants commissioners used defendant Appleton to intentionally and knowingly offer numerous false and indefensible reasons as to why plaintiff's and Sharpe's salaries should not be increased in accordance with state policy.

(114) During these meetings, plaintiff and Sharpe salaries were fixed at various amounts substantially below that mandated by policy, notwithstanding the fact that plaintiff put forth uncontroverted proof that revealed the policy. Specifically, plaintiff presented the commissioners with a Memo that plaintiff had received from Shaun C. McDonough, Compensation Analyst for the Office of Policy and Management which stated that it was the state practice to fix the salary for personnel holding positions in the Executive Pay Plan at the mid point of the salary range for the position held by the employee.

(115) In an effort to get to the bottom of the issue, plaintiff submitted a written request to both defendants Ryan and Waters who knowingly and intentionally provided

25