the commissioners with false and incorrect information. Specifically, (acting through Deputy DAS Commissioner, Al Mozola), they advised the commissioners that even though the Governor had established the compensation policy contained in the Shaun C. McDonough Compensation Directive, that notwithstanding this Directive, the commissioners were able to establish a difference salary formula if they choose to do so.

(116) Thereupon, plaintiff reminded DAS of the Compensation Policy Directive that DAS had given to commission in 1994, following an attempt by the commissioners to increase the salaries of its statutory office holders, (that is, the Executive Director, the Deputy Director(s) and the General Counsel), to an amount that exceeded that established in the Governor's Compensation policy but which remained within the salary range for each position.

(117) In a nutshell, in its 1994 Directive, DAS advised the commissioners that they did not have the authority to authorize the payment of a salary different from that established in the Governor's compensation policy, notwithstanding the fact that the salary established by the commissioners was within the range of compensation fixed in the Executive Pay Plan for the position.

(118) Ultimately, defendants elected to pay plaintiff $90,000 per year as apposed to the $102,000 that plaintiff was entitled to be paid in accordance with the compensation formula established by the Governor. Additionally, plaintiff states on information and belief that defendant Elder was paid $102, 000 for the time she served as the commission's Acting Executive Director and that insofar as plaintiff has been able

26

to ascertain; the only difference for the disparity in compensation is the gender of the respective parties.

(119) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT IX, DISPARATE TREATMENT DISCRIMINATION
## CHRO'S - REGIONAL MANAGER'S POSITION

(120) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Eight above.

(121) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was discriminatorily denied employment by the defendant, CCHRO, acting through its Executive Director, defendant Elders due to plaintiff's race and/or gender under the following terms and conditions.

(122) Sometime prior to November 11, 2001 CCHRO issued a vacancy announcement for a Regional Manager to be stationed in its Waterbury, West Central Office

(123) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(124) In response to the announcement, plaintiff prepared and submitted his application that, according to instructions, which application also constituted defendant's CCHRO's qualification examination.

27

(125) Thereafter, defendant, State of Connecticut's Department of Administrative Services, notified plaintiff that he had passed the eligibility examination and that this information was being transmitted to the Commission On Human and Rights and Opportunities.

(126) Plaintiff had received no further official notice about the current status of the vacancy until on or about December 1, 2002 and until plaintiff received this information plaintiff had assumed that CCHRO was still in the application and selection processes with respect to said position.

(127) As a matter of fact, until on or about December 1, 2002, plaintiff was of the opinion that CCHRO had elected to terminate its efforts to fill said vacancy due to budgetary reasons and for reason that CCHRO wanted to avoid having to staff said position with the plaintiff.

(128) However, on or about December 1, 2002 when plaintiff learned of the discriminatory act as a result of an employee of CCHRO calling plaintiff residence and telling plaintiff that the position had been staffed.

(129) Furthermore, plaintiff states that the only reasons he was not hired in the vacant position were due to defendants electing to continue to discriminate against plaintiff as a result of his prior employment with defendant CHRO and due to defendants Elder and Appleton, acting in conjunction with defendants commissioners, electing to retaliate against plaintiff inasmuch as plaintiff filed his previous suit against defendants accusing them of various act of illegal discrimination.

(130) Likewise, plaintiff states that the conduct that forms the subject matter of this complaint is a mere continuation of the conduct described above and constitutes

defendants' discriminatory design to deny plaintiff employment because of his race and gender in violation of the Section 46a-60 and following of the Connecticut General Statutes.

(131) IN CONCLUSION, plaintiff states that defendant, CCHRO's decision to deny him employment in their vacant managerial position was motivated by a desire to retaliate against plaintiff for having filed a prior lawsuit against defendants and based solely on plaintiff's race and gender and/or the race and/or gender of the successful candidate

## COUNT X: DEPRIVATION OF CONSTITUTIONAL PROTECTED LIBERTY

(132) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Nine above.

(133) The facts pertinent to this cause of action are hereinafter setout. As previously setout these facts show that defendant, State of Connecticut, acting through its' Commission on Human Rights and opportunities employed plaintiff in August 1991.

(134) Further, they show that defendants, the named commissioners of the Human Rights Commission and a number of the defendant, State of Connecticut, elected officials, repeatedly made false statements to the media that were defaming and that resulted in stigmatizing plaintiff's reputation, good name and integrity.

(135) Specifically, they show that for a period of time in excess of two years, the identified defendants, acting in concert with their employees, agents and elected officials, among other persons, made and published, both verbal and non-verbal, false statements that plaintiff was incompetent inasmuch as defendants accused plaintiff of having mismanaged the Commission of Human Rights and Opportunities.

29

(136) Similarly, the identified defendants made and published other statements that accused plaintiff of being incompetent in the performance of his duties as the Commission's Deputy Director for Enforcement inasmuch as these individuals accused plaintiff of having rendered the commission dysfunctional with respect to its ability to process complaints of discrimination.

(137) In like manner, these individuals accused plaintiff of being a racist and of having subjected the commission's white employees to a pattern and practices of egregious discrimination that, according to defendants, resulted in plaintiff discriminatorily replacing all of the commission's White managerial employees with Black employees.

(138) In essence, defendants' false statements accused the plaintiff of being grossly incompetent with respect to plaintiff's ability to manage the Field Operations Division of the Commission, but they also accused plaintiff of being grossly incompetent with respect to plaintiff's ability to administer the State's anti-discrimination laws and regulations.

(139) Further the facts show that, at the time of plaintiff's discharge, defendants republished these defamatory and false allegations to the media. Specifically, defendants elected to discharge plaintiff in such a manner as to communicate to the public that plaintiff's tenure with the commission had been so disastrous as to make it necessary for them to have plaintiff forcibly removed off state property.

(140) In this respect, defendants made arrangements to have a state trooper to escort plaintiff off state property which fact was widely published in the state print media and which had the effect of communicating to all future employers, to whom plaintiff

may apply in the future, that plaintiff possessed criminal proclivities that made it necessary for defendants to invoke the state's criminal law processes in order to remove plaintiff from its' premises.

(141) In other words, plaintiff states that the manner in which defendants elected to discharge plaintiff, constitutes a non-verbal statement that was communicated to, and published by the media, which resulted in plaintiff being subjected to public opprobrium thereby damaging plaintiff's reputation and precluding all possibilities of plaintiff ability to find employment in his chosen profession.

(142) Further, the facts show that not only did defendants rely on these false statements to terminate plaintiff's employment but that defendants have consistently relied on these false statements to bar plaintiff from future employment with the State of Connecticut. In this respect, the facts show that in addition to relying on these false statements to support their decision to terminate plaintiff's employment, defendants also relied on these knowingly false statements to deny plaintiff's employment in their Director of Field operations position.

(143) Additionally, the facts show that defendants failed to provide plaintiff a process in which plaintiff could attempt to clear in name and reputation.

## COUNT XI, DEPRIVATION OF PLAINTIFF'S RIGHT OF ASSOCIATION

(144) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Ten above.

(145) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for defendant's, Commission On Human Rights and Opportunities,

31

Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to free speech and association in violation of the First and Fourteenth Amendments, United States Constitution; Section 3, 4, and 14 of the Constitution, State of Connecticut, and the protections afforded plaintiff by Section 31-51q, of the Connecticut General Statutes.

(146) The facts pertinent to this cause of action are hereinafter setout. As previously setout these facts show that defendant, State of Connecticut, acting through its' Commission on Human Rights and opportunities employed plaintiff in August 1999. Specifically, the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, employed Plaintiff pursuant to a recommendation made by its' recently employed Executive Director, Mr. Louis Martin. The Commission employed Martin in January 1991.

(147) Plaintiff was employed in the Commission's Deputy Director for Enforcement position. Execution of the responsibilities of this position, required Plaintiff oversee the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.), subject to the instructions and directions that plaintiff received from Louis Martin, the Commission's Executive Director and such policy directives and regulations implemented by the commission.

(148) Specifically, plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint investigation activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

32

(149) The commission's hierarchical structure, including its powers and duties are set out in the Act. Essentially, the Act provides that the commission is to be governed by a nine-member panel of commissioners who are to establish commission policies and oversee its total effective and efficient operation. To achieve this goal, the Act empowers the commission with broad authority which include the hiring of the commission's Executive Director and General Counsel. Similarly, by way of the commission's duly enacted regulations, the commission must lend its advice and consent to the hiring of a deputy director.

(150) In like manner, the Act provides that the Executive Director shall serve as the chief executive officer of the commission and in this capacity the executive shall be responsible for overseeing the day-to-day operations of the commission which includes, subject to the policy making input of the commission, the authority to promulgate, administer and oversee the commission's budget, the authority to administer and oversee all personnel matters, including the hiring and firing of staff, and the responsibility of implementing the requisite processes and procedures essential to effective enforcement of the Act's, i.e., the elimination of all vestiges of discrimination made illegal by the Act.

(151) As such, in order for plaintiff (and all managerial personnel) to perform the duties and responsibilities of his job, it was essential for plaintiff to come into daily association with Mr. Martin for purposes of addressing matters of public concern, that is, the ways and means, the policies and procedures that the commission's Field Operations Division was to implement and administer in its' effort to execute its'

33

statutory mandate to eliminate all vestiges of illegal discrimination through effective and efficient complaint investigation and enforcement.

(152) During the eight plus years in which plaintiff staffed the commission's Deputy Director for Enforcement position, plaintiff (and again, all of the commission's managerial employees) was required to come into daily association with Mr. Martin the purposes set out above.

(153) Notwithstanding the need to associate with Martin for purpose of addressing issues of public concern, i.e., the effective enforcement of the Connecticut Anti-Discrimination Act, Defendants elected to discharge plaintiff for engaging the very act mandated by the statutory scheme and without which the statutory scheme could not be enforced in the collegiate manner in which the Act contemplates, that is, a hierarchical division of labor structure.

(154) In this respect, plaintiff notes that the only reason defendants have given for their decisions to discharge and not rehire plaintiff, is contained in defendants' Answer to plaintiff's original complaint. There, in their response to paragraphs 27 and 28, defendants explained that their decision to discharge not to rehire plaintiff was based on:

> " ...**decisions that 'Martin and [plaintiff] made which effect was to eventually rid the commission of all of its white managers and replace them with black managers'." |**

(155) Inasmuch as the facts clearly show, as setout above, that Martin possessed the exclusive authority to hire or fire staff, it's obvious that defendants' explanation is a mere façade to hide the real reason that motivated their adverse decisions, that being, plaintiff's association with Martin.

34

(156) Additionally, plaintiff submits that the facts, as setout in the preceding counts, clearly demonstrate that the genesis of the problem that arose between Martin and the defendants grew out of the manner in which Martin exercised his managerial powers with respect to the commission's personnel, especially its' white personnel. From the viewpoint of defendants and many elected officials, Martin exercised these powers in a racial manner so as to subject the commission's white employees to a pattern and practice of race discrimination.

(157) However, despite the almost daily association that plaintiff (and all managerial personnel) had with Martin respecting the commission's enforcement processes and procedures, including its' staffing needs, no white employee ever accused plaintiff of having subjected him or her to race based discrimination.

(158) Hence, plaintiff submits that the facts clearly establish that his association with Martin for the purposes hereinabove setout did not interfere substantially or even immaterially with plaintiff's bona fide job performance or with plaintiff's working relationship with defendants.

(159) Consequently, plaintiff submits that defendants' decisions to discharge and not rehire plaintiff for exercising his First Amendment protected right to freedom of association constitutes a violation of plaintiff's rights as protected by the federal and state constitutions and Section 31-51q, CGS.

## COUNT XII, DEPRIVATION OF RIGHT OF FREE SPEECH ARISING OUT OF PLAINTIFF'S WHISTLE BLOWER COMPLAINT

(160) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Eleven above.

35

(161) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for defendant's, Commission On Human Rights and Opportunities, Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to free speech and association in violation of the First and Fourteenth Amendments, United States Constitution; Section 3, 4, and 14 of the Constitution, State of Connecticut, and the protections afforded plaintiff by Section 31-51q, of the Connecticut General Statutes.

(162) The facts pertinent to this cause of action are hereinafter setout. Plaintiff states that within days of his notifying the commissioners of the conduct that had come to his attention respecting defendant Appleton's misfeasance and/or malfeasance in office, he also notified them of the fact that he had filed a Whistle Blower complaint with the Office of the State Auditors detailing the conduct that he had earlier called to their attention.

(163) Thereafter, within days of notifying defendants of his having filed said complaint; plaintiff was removed from his position as Acting Executive Director.

(164) Plaintiff states that he believes that defendants' decision to remove his Acting position was made in direct retaliation for his having filed the Whistle Blower complaint.

(165) Further plaintiff states that upon investigating the complaint, the State Auditors found that defendant Appleton had been derelict in the performance of her duty

36

as claimed by plaintiff and that her conduct in all likelihood caused the State to lose thousands of dollars in interest payment.

(166) Additionally, plaintiff states that his filing the complaint constitutes protected speech under the laws set out in the preceding count inasmuch as the speech was on a matter of public interest and that defendants' retaliatory conduct constitutes a deprivation of plaintiff's rights protected by said laws.

### COUNT XIII: DEPRIVATION OF PLAINTIFF'S RIGHT TO EQUAL PROTECTION OF THE LAW AND PATTERN AND PRACTICE DISCRIMINATION

(167) Plaintiff adopts and incorporates herein each and every allegation contained in Counts One through Twelve above.

(168) In addition, to the foregoing discriminatory and otherwise illegal conduct, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for defendant's, Commission On Human Rights and Opportunities, Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to the equal protection of the law.

(169) In support of this cause of action plaintiff states that to the extent defendants elected to terminate plaintiff's employment and refuses to rehire plaintiff due to plaintiff having associated with Martin on the same terms and conditions as did all of the commission's white managerial employees, that said treatment constitutes a deprivation to plaintiff's constitutionally protected rights to equal treatment under laws of the United State and State of Connecticut.

(170) Moreover, plaintiff states that subsequent to his discharge in 1999, that he has been subjected to numerous acts of illegal discrimination by defendants CHRO commissioners and employees and by defendant Waters and members of her staff acting pursuant to her instructions and/or with her knowledge as result of plaintiff's efforts to secure re-employment with the defendant, State of Connecticut and that each of said acts of illegal discrimination were engaged by defendants, in conjunction with other state employees acting under color of the constitution, laws, regulations and policies of the United States and the State of Connecticut.

### SECTION IV REMEDIAL RELIEF

WHEREFORE, premises considered, Plaintiff prays that this court schedule this matter for trial on the merits before a jury of plaintiff's peers and thereupon, after duly considering all the relevant and material evidence, enter its Order awarding plaintiff's such relief as he maybe entitled, in equity and at law; and for all other necessary and proper relief.

Respectfully Submitted,

Jewel E. Brown.

By: _____.

    Jewel E. Brown, pro se
    21 BREWSTER
    SOUTH WINDSOR, CT. 06074
    PHONE (860) 644-5379
    FAX (860) 644-6551
    E-MAIL: employmentpa@aol.com

## CERTIFICATE OF SERVICE

Plaintiff hereby certifies that he has caused a copy of the foregoing going pleading to be served upon Defendants' Attorneys this 10th day of February, 2005, by depositing a copy of the same in U. S. mail, postage prepaid, and addressed to Defendants' Attorneys' address shown of record in this matter.

Respectfully submitted

By: _____

Jewel Brown, pro se

39