IN THE UNITED STATED DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Jewel E. Brown, <br> PLAINTIFF. | ) <br> ) <br> ) |
| VS    Docket # 3:02CV223(CFD) | ) <br> ) <br> ) |
| The State of Connecticut, et al., <br> DEFENDANTS. | ) <br> ) <br> ) August 3, 2005 |

### Plaintiff's Memorandum of Law In Support of Motion For Leave of Court To File Technical Amendment Naming Defendants Linda Yelmini, R. Hamisi Ingram and Robert Genuaio As Parties Sub Nominee

Plaintiff submits the following memorandum of law in support of his Motion for Leave of Court to file a Second Amended and Supplemented Complaint.

Plaintiff filed this complaint on or about the 6th day of February 2002. In it, among other individual defendants, Plaintiff named the Honorable Cynthia Watts Elder, in her individual and official capacity as Executive Director of the Commission on Human Rights and Opportunities. Thereafter, on or about the 29th day of April 2004, Plaintiff amended his Complaint and added: the Honorable Barbara Waters and Mark Ryan in their individual and official capacities as Commissioner and Secretary, respectively of the Department of Administrative Services and the Office of Policy and Management.

In the complaint, Plaintiff alleged that each of these defendants, intentionally and knowingly, engaged in conduct that subjected, and continues to subject, Plaintiff to various acts of illegal discriminatory treatment and, as such, that Plaintiff is entitled to such relief as provided in law and equity to remedy the

alleged violations. For example, in count II and III of the complaint, plaintiff alleges that defendant Elder joined into the discriminatory conduct by engaging numerous illegal acts that simultaneously removed Plaintiff from his Deputy Director of Enforcement position and denied plaintiff the opportunity to compete for the CHRO vacant Director of Field Operations Position. Specifically, respecting defendant Elder's discriminatory conduct, the complaint pled that Elder, among others, engaged conduct that "... precluded plaintiff from having an opportunity to apply for this position by electing to summarily promote Donald Newton, white male, employee into the position. In doing so, [defendant Elder was] motivated by [her] desire to terminate and/or preclude the employment of all black managerial employees in the Martin administration".

In like manner, the complaint alleged that defendants Ryan and Waters engaged in similar discriminatory conduct. For example, the complaint alleges, that defendants Ryan and Waters, acting in conjunction with the other named defendants: "... met on numerous occasion [with other defendants so that defendants Ryan and Waters could] identify some black person in state government that they could put in charge of the commission [thereby discriminatorily removing Plaintiff from his Acting Executive Director's position due solely to the fact that plaintiff refused to] consent to defendant Appleton, [CHRO's white female, Business Manager] having exclusive jurisdiction over all of the commission's personnel and budgetary matters".

To support this allegation the complaint quotes defendant Elder as having explained her appointment into CHRO's Acting Executive Director's position in March of 1999 as follows:

> "... [that she was] actively solicited ... for the position. Specifically, according to Elder, she was called out of a meeting and instantaneously offered the position and was told that she had to make up her mind right then and there (on the spot)".

The complaint also alleges that defendants Ryan, Waters and Elder knowingly and intentionally conspired with the other named defendants to deny Plaintiff, and other Black CHRO employees, compensation on a non-discriminatory basis in accordance with state policy. In this respect, the complaint alleges that "defendants Ryan and Waters knowingly and intentionally provided the commissioners with false and incorrect information [respecting the state's policy for compensating the commission's Black Executive Director and Deputy Directors] in the Executive Pay Plan for the position".

Again, in the complaint's prayer(s') for relief, plaintiff sought such legal and equitable relief as is provided by law. Hence, the complaint pled claims for prospective injunctive relief against each of these defendants.

However, subsequent to suing these individuals, they have severed their employment with the State of Connecticut and as such are no longer subject to the court's prospective injunctive remedies. Rather, these defendants have been replaced by those defendants that Plaintiff now seeks to technically name in this lawsuit.

Therefore, Plaintiff submits that this motion should be granted because Plaintiff seeks to name these defendants for the sole purpose of being able to

subject them to such prospective injunctive relief as this court deems appropriate to remedy the discrimination to which these defendants' predecessors subjected Plaintiff.

### Legal Standard - Motion For Leave To Amend
### Rule 15 - Federal Rule Civil Procedure

The standard governing whether to grant or deny a motion for leave to amend a complaint is set out in Rule 15 (a), FRCP. In this respect, the Rule provides "... leave shall be freely given when justice so requires". Both the United States Supreme Court and the Second Circuit Court of Appeals have interpreted the standard embodied in the Rule. In the case of <u>Foman v. Davis</u>, 371 U.S. 178, (1962), the Supreme Court reversed the First Circuit Court of Appeals' decision denying plaintiff the right to, among other things, amend his complaint. The Court observed:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. See generally, 3 Moore, Federal Practice (2d ed. 1948). <u>If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits</u>. In the absence of any apparent or declared reason - such as <u>undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.</u> - the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, **but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules**, at 182.

Similarly, in <u>Salahuddin v. Cuomo</u>, the Second Circuit held:

> "... in light of our jurisprudential preference for adjudication of cases on their merits rather than on the basis of formalities, it is generally an abuse of discretion to deny leave to amend when dismissing a nonfrivolous

4

original complaint on the sole ground that it does not constitute the short and plain statement required by Rule 8)", 861 F. 2d 40 (2d Cir. 1988), at 42.

In 1990, the Second Circuit reaffirmed this holding in Creswell v. Sullivan & Cromwell, 922 F.2d 60, at 72, (2d Cir. 1990). It held:

> "... although leave to amend a complaint should be freely given where justices so requires, (citation omitted), the district court has discretion to deny leave to amend where the motion is made after **an inordinate delay**".

Hence, plaintiff submits that none of the infirmities identified in the above decisions, as justification for denying the motion, are present here. Therefore, absent defendants identifying such infirmities, plaintiff submits that the motion should be granted unless the court determines that plaintiff's proposed amended complaint fails to set forth plaintiff's claim in a "short and plain statement that is sufficient to give defendants fair notice of what the claim is and the grounds upon which it rests" [See: Rule 8, FRCP and Leatherman, et al v. Tarrant County Narcotics Intelligence and Coordination Unit, et al, 507 U.S. 167, at 168-169, (1993).

In other words, plaintiff submits that the motion should be granted unless the court determines that the proposed amended claim fails to set forth facts upon which relief can be granted. [Ibid] Similarly, plaintiff notes that the Second Circuit has, on numerous occasions, accorded a like interpretation to the requirements of Rule 8, FRCP, which set forth the sufficiency standard that the complaint must satisfy, [See: David R. Kittay, Trustee, v. Kornstein and kornstein Veisz & Wexler, Docket No. 00-7306, Decided, October 20, 2000. The Court commented:

> Federal Rule of Civil Procedure 8 requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule also requires that "[e]ach averment of a pleading shall be simple, concise, and direct." Fed. R. Civ. P. 8(e)(1). Under the Rules' liberal pleading standards, a plaintiff must disclose sufficient information to permit the defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) **"Dismissal . . . is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."** *Salahuddin v Cuomo* 861 F.2d 40, 42 (2d Cir. 1988).

Likewise, plaintiff submits that the proposed amendment should be granted unless the pleading is "**so confus[ing], ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."**

In summary, plaintiff submits that this court should grant the motion because the proposed amendment meets the foregoing standards, that is: (1) it set forth plaintiff's amended claim in a short and plain statement that is sufficient to give defendants fair notice of what plaintiff's claim is and the grounds on which it rests; and (2) it is not the subject to any of the following infirmities, to wit: (a) undue and/or inordinate delay, (b) bad faith or dilatory motive on the part of the movant; (c) repeated failure to cure deficiencies by amendments previously allowed; (d) undue prejudice to the opposing party by virtue of allowance of the amendment and/or futility of amendment; and (e) so confusing, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.

In this respect, plaintiff submits that the proposed amendment is not the subject of undue and/or inordinate delay because here the individuals whom plaintiff seeks to add sub nominee were just recently appointed to their offices,

6

that is, their appointments occurred between October 2004 and April 2005, (See Exhibits 1 thorough 3). Moreover, these individuals appointments occurred during the time frame this court has been considering Defendants' Motion for Partial Summary Judgment on the basis, at least in part, that the Eleventh Amendment prohibits the naming of these and/or any other defendants in the official capacities. Hence, until this court adjudicates this Motion, the proposed parties can not be added.

Similarly, Plaintiff states, for the reasons earlier set out, that the proposed amendment is not subject to any of the other deficiencies referenced above. In this respect, plaintiff submits that the proposed amendment is not the product of a bad faith or a dilatory motive. Nor has plaintiff repeatedly failed to cure the deficiency that the proposed amendment is intended to address. This is so because the proposed amendment is not intended to address a deficiency. Rather, its sole purpose is to remedy a situation created by the retirement and replacement of Defendants' officials, a situation over which plaintiff has no control.

Finally, Plaintiff submits that granting the proposed amendment will not subject Defendants to undue prejudice and that the proposed amendment is not confusing, ambiguous, vague, or otherwise unintelligible. Consequently, Plaintiff submits that this court should grant Plaintiff leave to amend his complaint as proposed herein.

## CONCLUSION

THEREFORE, IN CONCLUSION, and for the foregoing reasons, Plaintiff respectfully submit that the prayed for relief should be granted.

Subj: **(no subject)**
Date: 7/1/2005 1:44:18 PM Eastern Standard Time
From: noreply@il.proquest.com
To: employmentpa@aol.com

# ProQuest

The following document has been sent by fae at CONNECTICUT STATE LEGISLATURE via ProQuest, an information service of the ProQuest Company. **Please do not reply directly to this email.**

## Documents

- **NEW CHRO DIRECTOR IN HOT SEAT:[5 NORTHWEST CONNECTICUT/SPORTS FINAL Edition]**

  *STAN SIMPSON.* **Hartford Courant** Hartford, Conn.:Oct 20, 2004. p. B1

! All documents are reproduced with the permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

Citation style: ProQuest Standard

**Document 1 of 1**

## NEW CHRO DIRECTOR IN HOT SEAT:[5 NORTHWEST CONNECTICUT/SPORTS FINAL Edition]

*STAN SIMPSON.* **Hartford Courant** Hartford, Conn.:Oct 20, 2004. p. B1

| | |
|---|---|
| People: | Ingram, R Hamisi |
| Author(s): | STAN SIMPSON |
| Document types: | COLUMN |
| Column Name: | *STAN SIMPSON* |
| Section: | *CONNECTICUT* |
| Publication title: | Hartford Courant. Hartford, Conn.: Oct 20, 2004. pg. B.1 |
| Source type: | Newspaper |
| ISSN/ISBN: | 10474153 |
| ProQuest document ID: | 717746001 |
| Text Word Count | 761 |
| Document URL: | http://proquest.umi.com/pqdweb?did=717746001&Fmt=3&clientId=61806&RQT=309&VName=PQD |

**Abstract** (Document Summary)

Established in 1943 to be the watchdog for age, race, gender and other forms of discrimination, the commission has acted more like a lap dog in recent years. It's lost its bark, bite and its compass. The image is of a commission seemingly content with dragging out investigations. CHRO has essentially seceded from its role to ensure minorities and women are part of the employment and contract mix at state agencies.

The contract compliance division, which monitored whether minorities and women were included in the hundreds of millions of dollars awarded in state contracts, was dismantled. CHRO employees overseeing affirmative action compliance in state agencies were cut in half -- from four to two.

[R. Hamisi Ingram], who is African American, has a background deeply rooted in civil rights. In the early 1970s, he was an assistant attorney general for civil rights in Columbus, Ohio. His last job was senior program and compliance specialist at the Washington Metropolitan Area Transit Authority, where he allocated 21 percent of the $284 million awarded in state contracts to firms owned by minorities or women.

**Full Text** (761 words)

*(Copyright The Hartford Courant 2004)*

The new executive director of the nation's oldest civil rights agency pictured his pre-retirement years in balmy Phoenix, teaching at a law school.

Instead, R. Hamisi Ingram, 56, finds himself in New England. The chill is biting here, and, as he's finding out, the heat needs to be turned up on the state Commission on Human Rights and Opportunities, which he took over in August.

Established in 1943 to be the watchdog for age, race, gender and other forms of discrimination, the commission has acted more like a lap dog in recent years. It's lost its bark, bite and its compass. The image is of a commission seemingly content with dragging out investigations. CHRO has essentially seceded from its role to ensure minorities and women are part of the employment and contract mix at state agencies.

The contract compliance division, which monitored whether minorities and women were included in the hundreds of millions of dollars awarded in state contracts, was dismantled. CHRO employees overseeing affirmative action compliance in state agencies were cut in half -- from four to two.

This would be akin to a police department doing away with its powers of arrest. If CHRO, with its $6 million budget, were a federal agency with this kind of noncompliance, it would lose its funding.

Throughout its history, the commission has been embroiled in controversy. In the late 1990s, then-Executive Director Louis Martin was at odds with the Rowland administration. Martin was a polarizing figure, but one unafraid to expose state agencies negligent in hiring people of color. He not only would publicly out them, but had the authority to freeze their hiring, until they developed a comprehensive diversity plan.

That did not go over too well with the politically connected management types.

As one lawyer close to CHRO said, the Rowland administration had a choice. It could fix the problem or get rid of the messenger. Martin's bombastic personality and his conflicts of interest as a "diversity consultant," made the decision easy. The commission replaced him with Cynthia Watts Elder, a bureaucrat from the Office of Policy and Management with scant civil rights experience.

In short order, Watts Elder reduced or eliminated the most essential elements of her commission.

"I can tell you, it should never have happened," says Ingram of the gutting of the compliance division. "I've never heard of a civil rights agency taking this kind of hit in an area that is mandated by statute. I didn't realize that the entire [compliance] unit was gone. In my wildest dreams, I wouldn't have thought that a state would do that to itself."

Ingram, who is African American, has a background deeply rooted in civil rights. In the early 1970s, he was an assistant attorney general for civil rights in Columbus, Ohio. His last job was senior program and compliance specialist at the Washington Metropolitan Area Transit Authority, where he allocated 21 percent of the $284 million awarded in state contracts to firms owned by minorities or women.

The Alabama native is also a lawyer and an entrepreneur who owns a record company and has invested in real estate and owned radio stations.

He's what CHRO needs right now -- unquestioned civil rights credentials and someone not beholden to the local politics. He admits, life in Phoenix was looking sweet. Until he saw the commission's job posting.

"It was intriguing to me to think that I could head up the oldest agency in the country, and I thought it might not be experiencing its heyday. And, that I could bring it back," Ingram says.

Ingram plans to re-establish the contract compliance division and he wants his investigators out in the field more. He promises to reduce the time it takes to complete an investigation from two years to 90 days.

"We've got some good folks here who want to do good work," Ingram says. "Unfortunately, there's been some misdirection along the way."

While the agency was floundering, billions of dollars in public money was allocated for contracts. And many of the major state agencies -- Correction, Children and Families, even a quasi-public entity such as the Metropolitan District Commission -- were awash with multiple complaints of workplace discrimination. A recent study of Connecticut's criminal justice found that the incarceration for African Americans is above the national average.

Unfortunately, a state-sanctioned toothless tiger has been on watch while disparities rooted mostly in race have gone unchecked.

Ingram was looking for warmth when deciding to make his latest professional move. He chose Connecticut instead.

Now let's see him light a fire.

Copyright © 2005 ProQuest Information and Learning Company. All rights reserved. Terms & Conditions



Please do not reply directly to this email. Use the following link to contact ProQuest: http://www.proquest.com/division/cs-support.shtml

*Plaintiff's Exhibit #02*

# The Office of Governor M. Jodi Rell
**Press Releases - 12/2004**



STATE OF CONNECTICUT
EXECUTIVE CHAMBERS
HARTFORD, CONNECTICUT 06106

M. JODI RELL
GOVERNOR

FOR IMMEDIATE RELEASE
December 22, 2004

Contact: Dennis Schain
860-524-7313
dennis.schain@po.state.ct.us

## Governor Rell Names Top State Labor Attorney to Lead Department of Administrative Services

*Names DPW official to serve as DAS Deputy Commissioner*

Governor M. Jodi Rell today nominated Linda Yelmini, the state's top labor lawyer, as the new Commissioner of the Department of Administrative Services (DAS).

Yelmini, 54, of Glastonbury has served as the state's Director of Labor Relations at the Office of Policy and Management (OPM) since 1997.

"Linda is a veteran of state government whose experience in labor relations has provided her with extraordinary insight into the workings of our state agencies," Governor Rell said. "She also brings to the job a great talent for working with people and the ability to get things done. I am confident that under her leadership DAS will continue to develop and implement many successful initiatives that will help state government operate more efficiently and effectively."

As Director of the Office of Labor Relations, Yelmini serves as the Governor's designated representative for collective bargaining matters with state employees. Yelmini represented the state during contract negotiations, midterm bargaining and interest arbitration with 13 state employee bargaining units. Yelmini served as Assistant Director of Labor Relations from 1990 to 1997.

"Linda will play a central role in meeting one of my key goals: Making sure the state meets its targets for contracting with small, minority-owned and women-owned businesses," Governor Rell said. "This will take a lot of coordinating, and I can't think of anyone better suited for the job than Linda."

P's Exhibit #3

| | |
|---|---|
| Subj: | **(no subject)** |
| Date: | 7/1/2005 11:35:02 AM Eastern Standard Time |
| From: | noreply@il.proquest.com |
| To: | employmentpa@aol.com |

[ProQuest]

========================================================================
The following document has been sent by fae at CONNECTICUT STATE LEGISLATURE via ProQuest, an information service of the ProQuest Company. Please do not reply directly to this email.

========================================================================
Documents


**NEW FACES IN HIGH PLACES ; SWEEPING CHANGES IN CAPITOL LEADERSHIP:[5 NORTHWEST CONNECTICUT/SPORTS FINAL Edition]**
CHRISTOPHER KEATING, Capitol Bureau Chief, Courant Staff Writer Mark Pazniokas contributed to this story.. Hartford Courant Hartford, Conn.:Jan 5, 2005. p. A1

! All documents are reproduced with the permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

========================================================================
Citation style: ProQuest Standard

Document 1 of 1




**NEW FACES IN HIGH PLACES ; SWEEPING CHANGES IN CAPITOL LEADERSHIP:[5 NORTHWEST
CONNECTICUT/SPORTS FINAL Edition]**
CHRISTOPHER KEATING, Capitol Bureau Chief, Courant Staff Writer Mark Pazniokas contributed to this story.. Hartford Courant Hartford, Conn.:Jan 5, 2005. p. A1

| | |
|---|---|
| People: | Grasso, Ella, Rell, M Jodi, Amann, James, Dyson, William |
| Author(s): | CHRISTOPHER KEATING, Capitol Bureau Chief, Courant Staff Writer Mark Pazniokas contributed to this story. |

Friday, July 01, 2005 America Online: Employmentpa

Section:        MAIN (A)

Publication title: Hartford Courant. Hartford, Conn.: Jan 5, 2005. pg. A.1

Source type:    Newspaper

ISSN/ISBN:      10474153

ProQuest document ID:   774263611

Text Word Count   827

Document URL:   http://proquest.umi.com/pqdweb?did=774263611&Fmt=3&clientId=61806&RQT=309&VName=PQD

Abstract (Document Summary)

The question of whether to legalize gay marriage is also expected to come up. [M. Jodi Rell], [James Amann], and the Roman Catholic Church are all opposed. Many lawmakers, however, support a compromise position of allowing civil unions, which would grant some legal rights to same- sex couples.

Some lawmakers have called for legalizing marijuana for medical purposes, but the bill's chief proponent, Rep. James W. Abrams, D- Meriden, abruptly stepped down from his seat earlier this week and will not be taking the oath of office today. Capitol insiders say they suspect that Rell will appoint Abrams a Superior Court judge, but Abrams has declined to confirm that.

Amann defeated [William R. Dyson] after a clash in which House Republican leader Robert Ward said the GOP preferred Dyson over Amann. As a result, Amann has been on guard about any potential opening-day coup that could block his chances as speaker, even though insiders say that will not happen.

Full Text (827  words)

(Copyright The Hartford Courant 2005)

A new legislative session opens today at the state Capitol, and with it comes the most sweeping change in leadership since Ella Grasso became governor in 1975.

The entire top leadership -- the governor, Senate president and House speaker -- will be new to their positions and in control of how Connecticut's government approaches several high-profile issues.

The most critical issue facing the legislature -- a state budget deficit

projected to be as high as $1.3 billion -- will be resolved by a completely new team, including lawmakers and Gov. M. Jodi Rell's handpicked budget chief, former Sen. Robert Genuario.

For the past five years, the budget was mainly crafted by the same four key officials: Gov. John G. Rowland, Speaker Moira Lyons, Senate President Pro Tem Kevin Sullivan and budget director Marc Ryan. That foursome ranked among the most powerful people in state government -- deciding on the final aspects of the $14.3 billion annual budget and other key legislation.

"It's almost as if it's a Broadway play that's been very successful, and now it's a whole new cast on opening night," said Christopher Healy, a longtime Republican strategist. "It's not a revival. It's a first-run show. ... There are no benchmarks because everything is so unique."

The legislature's two highest-ranking members, Senate President Pro Tem Donald Williams Jr., D-Brooklyn, and House Speaker James Amann, D-Milford, will start today in their first full legislative sessions.

In addition, the two highest-ranking Republicans in both the House and Senate on the budget-writing appropriations committee will be new: Rep. Arthur O'Neill of Southbury and Sen. David Cappiello of Danbury.

There's also the strong possibility that an acknowledged budget authority, appropriations Chairman William R. Dyson, a New Haven Democrat, will be stripped of his chairmanship after unsuccessfully opposing Amann in a bitter fight for speaker of the House. Bipartisan spirit and rhetoric are high.

The budget is traditionally a difficult issue, but could be more so this year if Rell's deficit projections prove accurate.

Democrats say they believe Rell is presenting a worst-case scenario, and that the deficit will actually be from $500 million to $700 million -- still a difficult gap to close, but only half what the governor predicts.

Rell and her fellow Republicans will also be debating with members of the Democratic majority over embryonic stem-cell research, a controversial issue at both the national and state level. Rell wants to set aside as much as $10 million to $20 million in state money to promote research. Opponents want to block the research, saying the destruction of human embryos is tantamount to the destruction of life.

The question of whether to legalize gay marriage is also expected to come up. Rell, Amann, and the Roman Catholic Church are all opposed. Many lawmakers, however, support a compromise position of allowing civil unions, which would grant some legal rights to same- sex couples.

Some lawmakers have called for legalizing marijuana for medical purposes, but the bill's chief proponent, Rep. James W. Abrams, D- Meriden, abruptly stepped down from his seat earlier this week and will not be taking the oath of office

today. Capitol insiders say they suspect that Rell will appoint Abrams a Superior Court judge, but Abrams has declined to confirm that.

The sweeping nature of today's leadership change has not been seen at the Capitol in 30 years. The last time that the governor, House speaker, and Senate president pro tem were all new was in 1975, when Ella Grasso took over as governor. Under Govs. William A. O'Neill, Lowell P. Weicker Jr. and Rowland, either the speaker or the Senate president was already in office in a holdover position from previous years.

Behind the public face of cooperation on a largely ceremonial day lies the remains of the infighting that brought Amann to the speakership.

Amann defeated Dyson after a clash in which House Republican leader Robert Ward said the GOP preferred Dyson over Amann. As a result, Amann has been on guard about any potential opening-day coup that could block his chances as speaker, even though insiders say that will not happen.

Still, Amann has responded to the coup possibilities by refusing to name any committee chairs until Thursday -- one day after he is officially sworn in.

"I think that things are going to go well [today], but you just never know," Amann said.

Rep. Robert Farr, a West Hartford Republican with more than 20 years of experience at the Capitol, said he was surprised that Amann has avoided naming any committee leaders, a break with past practice.

"You have to laugh at Amann's paranoia," Farr said.

Democrats acknowledge that Rell, with her unprecedented approval ratings, has a unique leadership opportunity, but feel she has not yet taken advantage of her political capital to make new proposals.

The governor now needs to address the state's major challenges, Occhiogrosso said, including reducing transportation gridlock and improving medical care for about 350,000 people without health insurance.

===============================================================
Copyright © 2005 ProQuest Information and Learning Company. All rights reserved. Terms & Conditions

[From ProQuest Company]

Please do not reply directly to this email. Use the following link to contact ProQuest: http://www.proquest.com/division/cs-support.shtml