## IN THE UNITED STATED DISTRICT COURT
## DISTRICT OF CONNECTICUT

Jewel E. Brown,  )
Plaintiff,  )
 )
VS    #3:02CV223(CFD)  )
 )
Vivien Blackford, Commissioner; Commission on Human  )
Rights and Opportunity; Cynthia Watts Elder, Executive  )
Director, Commission on Human Rights and Opportunity,  )
Lee Ann Appleton, Business Manager, Commission on Human  )
Rights and Opportunity; and Andrew Norton, in his official  )
Capacity as Chairperson of the Commission on Human Rights  )
And Opportunity; Robert Genuario, in his official capacity as  )
Secretary of the Office of Policy and Management; and  )
Brenda Sisco, in her official capacity as Commissioner of the  )
Department of Administrative Services,  )
Defendants  )
 ) April 18, 2008

## PLAINTIFF'S THIRD SUBSTITUTED COMPLAINT, AS AMENDED

Comes now Plaintiff, Jewel E. Brown, and in support of his Third

Substituted and Amended Complaint against the defendants, individually and

collectively, alleges and states, as follows:

### SECTION I:: JURISDICTION

This is a suit at law and in equity authorized and instituted pursuant to

First and Fourteenth Amendments of the United States Constitution, Sections 3,

4, 14 and 20 of the Constitution of the State of Connecticut, 42 USC § 2000e-5 et

seq, as amended; 42 USC § 1981, as amended; 42 USC 1983.

This court's jurisdiction is invoked pursuant 28 USC § 1343, 28 USC §

1344, 28 USC § 2201 and 28 USC § 2202 providing for the equal rights of every

person in every state and territory in the United States.

Also, plaintiff invokes the court's pendent jurisdiction over discriminatory practices and freedom of speech and association claims arising under the Connecticut's Discriminatory Practices Act and Section 31-51q of the Connecticut General Statutes.

Plaintiff seeks to secure the protection of and redress the deprivation of rights secured and protected by the constitution and laws of the United States and the State of Connecticut which provides for injunctive, both temporary and permanent, relief and for monetary compensation for victims of racial and gender based discrimination and similar relief for the deprivation of an individual's rights of freedom of speech, association and the equal protection of the laws, among others.

## SECTION III - THE PARTIES

(1) Plaintiff is a citizen of the United States, residing in the state of Connecticut and in the town of South Windsor at 21 Brewster Road.

(2) Defendant, Andrew Norton in his official capacity as chairperson of the Commission on Human Rights and Opportunity.

(3) Defendants, Robert Genuario, in his official capacity as Secretary of the Office of Policy and Management.

(4) Defendants, Brenda Sisco, in her official capacity as Commissioner of the Department of Administrative Services.

(5) Defendants, Leeann Appleton and Cynthia Watts Elder are the former Business Manager and Executive Director of the Commission on Human Rights and Opportunities and at all times pertinent hereto exercised the powers of their

2

offices in such a manner as to intentionally subject plaintiff to illegal discriminatory injuries.

(6) Defendants, Vivian Blackford, is a former commissioner of the commission On Human Rights and Opportunities and at all times pertinent hereto exercised appointing and retention authority over one or more of the positions for which plaintiff applied and/or served and exercised her authority in such a manner as to intentionally subject plaintiff to illegal discrimination.

(7) Defendant Vivian Blackford, Leeann Appleton and Cynthia Watts Elder are being sued in both their individual and representative capacities and each defendant, during all times pertinent hereto, acted pursuant to and under color of the laws of the United States and the State of Connecticut.

## Historical Background

(1) Plaintiff was employed by the State of Connecticut, Commission on Human Rights and Opportunity on or about the 15th day of August 1991 in its Deputy Director for Enforcement position and except for the period of time commencing mid July 1998 through mid March 1999, plaintiff retained this position until his employment was severed on or about the 11th day of September 1999. During the July 1998 through March 1999 period, Plaintiff served as the Acting Executive Director of Defendants' Commission on Human Rights and Opportunities.

(2) Plaintiff was employed by the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, pursuant to a

3

recommendation of Mr. Louis Martin, whom the Commission employed as its Executive Director in January 1991.

(3) As the Commission's Deputy Director for Enforcement, Plaintiff was assigned the general duty and responsibility of overseeing the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.) Specifically, plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint investigation activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

(4) Plaintiff was employed by the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, pursuant to a recommendation of Mr. Louis Martin, whom the Commission employed as its Executive Director in January 1991.

(5) Plaintiff was assigned the general duty and responsibility of overseeing the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.) Specifically, plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint investigation activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

(6) Throughout Plaintiff's employment, Plaintiff performed the duties and responsibilities of his job without complaint, criticism, and/or incident.

Notwithstanding, a number of the Commission's employees; especially its white employees, commenced to allege that they were being subjected to illegal race based discrimination by the Commission's Executive Director, Louis Martin and various other members of its managerial staff. As a result of these allegations, various lawsuits were filed by the Commission's white employees.

(7) The following acts are illustrative of the conduct, that Martin engaged that the commission's white employees deemed discriminatory. These acts commenced in January 1992 when Martin employed Valerie Caldwell Gaines, and Femi Assegai, both black employees.

(8) At the time of their hire and placement, only one black employee was assigned to the commission's Capitol Region Office which employed roughly fifteen (15) employees;

(9) Shortly after the employment of these individuals, tension commenced to develop among and between the commission's white and black employees assigned to the Capitol Region Office.

(10) Thereafter, Martin, at the direction and knowledge of the Commissioners launched a thorough investigation into the cause(s) and sources of the disturbances.

(11) A three-member committee of management personnel investigated the allegations and, ultimately, no determinations of culpability and/or liability were made.

(12) Thereafter, when Martin elected to promote Mrs. Gaines to the position of Manager, the Office's white employees became more and more

convinced that Mr. Martin and Gaines were conspiring to subject them to illegal race based discrimination. Throughout this time-period, plaintiff visited frequently with Martin so that Plaintiff could fully understand the motivation for his decisions and was satisfied that they were not race based; even though Plaintiff ultimately disagreed with him as to some of the decisions that he made.

(13) Plaintiff made it a practice to conference with all commission's employees who deemed themselves victims of Martin's decisions so that they would at least have the benefit of Plaintiff analysis and, when appropriate, plaintiff would also share with them plaintiff's commitment to assist in their efforts to gain upward mobility in the Agency. Again, plaintiff deemed it extremely important to assure each employee that she/he would receive non-discriminatory treatment and, to the extent reasonable minds could agree, that they would also receive fair and equitable treatment.

(14) Despite these efforts, events continued to occur that white employees and white elected officials deemed to be manifestations of Martin's racist proclivities toward white persons.

(15) In this respect, in April 1996, the Connecticut Supreme Court issued its decision in the case of Angelsea vs. CHRO where it held, that the Commission's statutory scheme mandated that it complete its investigation to all complaints filed with it within a period of nine (9) months from the date of filing.

(16) Inasmuch as the potential consequences of this decision were substantial, the decision was widely covered by the state's media. In covering the

same, the media commenced to accord substantial coverage to statements made by Martin that the media deemed to suggest racial overtones.

(17) As such, a public frenzy developed surrounding Martin and what was perceived as his racist attitude toward white persons in general and white employees in particular.

(18) Simultaneously, at the request of Commission officials, the state legislature and governor passed Public Act 96-241. It contained several provisions that were intended to abate the adverse impact that the Angelsea decision would have otherwise had on those adversely affected by it. For example, it stayed the dismissal effect that the decision would have had on roughly a thousand complainants whose complaints would have been dismissed due to CHRO having failed to have completed its investigation into their complaints within a period of nine (9) months from the date their complaints were filed.

(19) The Act contained additional provisions that proved to be the source of great dissension. These provisions provided that the governor and various legislative office holders would appoint members to a task force to study the Commission's complaint processes. The Task Force was to make its report to the Law Revision Commission, an arm of the state legislature.

(20) Upon learning of the Task Force, its mission and reporting responsibilities, Martin became convinced that its purpose was to undermine the accomplishments of his administration by producing a report purporting to confirm repeated publicly allegations that he and his managerial staff were both

7

"racist and incompetent" and that these characteristics had resulted in his "administration's failure to remedy the agency's gross inability to competently implement and carry out the statutory purposes for which the agency was created".

(21) Consequently, Martin vowed not to cooperate with the ask Force nor the Legislation Revision Commission and communicated his decision to the Agency's commissioners; Governor Rowland, his chiefs of staff; the Secretary of the Office of Policy and Management and to the General Counsel of the Office of Policy and Management who now serves as the Chairperson of the CHRO.

(22) Similarly, throughout this period, plaintiff made his disagreement with Martin known. Plaintiff's opposition was manifested in various ways, including direct oral and written communication from plaintiff to Martin, commissioners and elected officials.

(23) Additionally, plaintiff sought and was granted permission from Martin to attend the Task Force's meetings as a resource person and, in this role, to provide the Task Force with whatever assistance plaintiff could – subject to Mr. Martin's permission.

(24) Notwithstanding plaintiff's well publicized disagreement with Martin's decisions that were perceived as being discriminatory, plaintiff was deemed and labeled a racist too solely because he is black and solely because defendants imputed Martin's perceived racist attitude to all of its black employees notwithstanding the fact that NO White EMPLOYEE EVER ACCUSED plaintiff

OF DISCRIMINATING AGAINST HIM/HER OR FILED A FORMAL COMPLAINT
AGAINST plaintiff ALLEGING DISCRIMINATION.

(25) Moreover, the undisputed facts show that plaintiff was neither a racist
nor incompetent. In this respect, the facts show that the Field Operation Unit was
superbly managed during this period. For example, under plaintiff's leadership
the Unit either remedied, or at a minimum, implemented corrective measures
capable of remedying its enforcement deficiencies. Specifically, under Plaintiff's
leadership the commission eliminated a backlog in excess of three thousand
(3000) complaints in its Field Operation Unit and a backlog of in excess of two
hundred fifty (250) complaints in its Public Hearings Unit.

(26) Nevertheless, and notwithstanding Plaintiff's job performance and
leadership ability, Plaintiff was subjected to the discriminatory conduct hereinafter
set out, which was principally engaged by defendants' Blackford, Appleton and
Elders.

## COUNT I - REJECTION OF PLAINTIFF'S
## EXECUTIVE DIRECTOR APPLICATION

The following facts are illustrative of the disparate treatment, pattern or
practice, discrimination to which plaintiff was subjected by defendants Blackford
and Appleton, acting in conjunction with Commission and state officials, in their
efforts to deny Plaintiff's promotion into the Commission's Executive Director's
position:

(1) Defendant Appleton was employed sometime after July 1994 by
Executive Director, Louis Martin, in the Commission's vacant Business Manager

Position and defendant Blackford was appointed Commissioner by the Honorable, John Rowland, Governor, sometime after 1996.

(2) As the foregoing history make evident, the defendants were employed and/or appointed during the height of Martin's racially charged ordeal with Commission and State officials.

(3) Subsequent to their employment/appointment, they have routinely and systematically engaged conduct intended to subject Plaintiff to illegal discrimination, including discriminatorily denying Plaintiff promotion into the Commission's vacant Executive Director Position.

(4) In this respect, the facts reveal that instead of defendant Blackford and the Commission's officials making an independent determination as to whether or not plaintiff had engaged conduct that subjected the Commission white employees to prohibited race based discrimination, they elected to impute Martin's perceived racially and militant attitude to plaintiff solely because both plaintiff and Martin are black.

(5) To illustrate this point, during to course of the public frenzy concerning Martin's perceived racist and militant attitude, in a report compiled by the State Auditors, Martin and members of his managerial staff, were accused of engaging numerous acts, some illegal and others - incompetent, that according to Commission and state officials "rendered the Commission out of control and dysfunctional."

(6) These acts ran the gambit from subjecting the Commission's white employees to illegal race based discrimination; operating a private business on

state time in violation of the State's Ethic laws and failing to properly inventory and maintain control over thousands of dollars in state personal property that had been assigned to the commission and, as such, was under his control.

(7) To ascertain the extent of these violations, the Attorney General and other state offices launched investigations into the conduct of the commission's managerial personnel; especially the Plaintiff and the Commission's Black managerial employees.

(8) Pending these investigations, the Commission launched its own internal investigation at which time defendant Blackford was appointed Chairperson of the Commission's Executive and Personnel Committee, a standing committee that has jurisdiction over all executive and personnel matters which includes, among other things, all managerial personnel, with special emphasis on those employees holding statutory offices, that is, those staffing the executive director position, a deputy director position and/or the general counsel.

(9) In order to investigate the white employees' allegations of racial discrimination, the Commission, at the suggestion of defendant Blackford, employed the services of an outside firm which was instructed to work in conjunction with the Commission's General Counsel and Business Office Manager, [apparently to the expressed exclusion of the deputy directors offices, inasmuch as – (at this time Louis Martin, the Executive Director, had gone out on an indefinite voluntary leave)].

(10) Overtime, it became obvious that defendant Blackford had become committed to the removal of all of the Commission's Black Managerial

employees. To achieve this end, she secured the support and cooperation of defendant Appleton.

(11) Thereafter, defendant Blackford actively lobbied the remaining Commissioners to modify the scope and statutory responsibility of the Commission's executive director and deputy directors' offices. These activities resulted in defendant Appleton being vested with pseudo authority to exercise the powers, duties and responsibilities statutorily vested in the executive director and deputy directors' offices. Consequently, the Commission's [executive] and deputy directors were excluded from participating in all administrative, personnel and legal matters.

(12 During this period, defendant Appleton sought to terminate, discipline and/or exert unilateral authority over compensation decisions involving several of the Commission's Black and minority employees; all to the disagreement and exclusion of Plaintiff who had statutory authority over these employees and their issues.

(13) Notwithstanding Plaintiff's efforts to convince defendant Appleton that she lacked the authority to exercise these decisions, Appleton insisted that she did and that she would continue to exercise these powers until she was instructed to cease and desist by either defendant Blackford and/or Chairperson Cioffi. Despite Plaintiff to reign in Appleton, he was totally unable to do for months.

(14) During the meantime, the Attorney General and State Auditors completed their investigations and issued their reports. It was determined that

several of the commission's white employees had, in conjunction with Martin, engaged prohibited conduct.

(15) In an effort to continue rally and maintain the support of the Commission's white employees, defendant Blackford personally persuaded the Commission that it should absorb white employees of all liability and even agreed to pay a thousand ($1,000) dollars fine imposed on one of its white employees by the Ethic Commission for having violated its laws due to the fact, according to defendant Blackford, "that these employees had been duped by Martin".

(16) Neither Plaintiff nor any other black employee was treated similarly. As a matter of fact, at the behest of defendant Blackford, acting in conjunction with other commissioners, a scheme was developed to rid the Commission of its Black managerial employees.

(17) As a result of this scheme, it became obvious that Martin's contract to serve as Executive Director, which expired in July 1988, would not be renewed.

(18) As such, in January of 1998, the Commission announced its search for an individual to staff its CHRO's Executive Director's position.

(19) The announcement stated that the successful candidate must have at leave four years of "managerial experience" and six years of progressive civil rights enforcement experience. The announcement also provided that education could be substituted for specified amounts of experience.

(20) At the time of the announcement, Plaintiff possessed in excess of twenty- three (23) years of relevant experience. As a result of this experience,

Plaintiff timely submitted an application for employment in the referenced position.

(21) Although, plaintiff was selected as one of the five finalists and best-qualified candidates, plaintiff's application was nonetheless rejected and Plaintiff was notified of this fact by letter dated February 1, 1999. No reason was given for the rejection.

(22) During the unfolding of the search activities, defendant Appleton continued to defy Plaintiff's, (who, as of this time, had been promoted into the Commission's Acting Executive Director Position), supervisory and managerial authority over Appleton. Consequently, in mid March 1999, Plaintiff sought to discipline Appleton by placing her on administrative leave, pending review and discharge, due to insubordination.

(23) Again, Appleton advised Plaintiff that he lacked this authority and that she would not honor his instruction until and unless this instruction was given to her by defendant Blackford. Upon being advised by Appleton that she would not recognize Plaintiff's directive, Appleton's access to the building was terminated.

(24) Between the time period in which Plaintiff notified Appleton that she was being placed on administrative leave and the Commission next scheduled meeting, (and for the sole purpose of depriving Plaintiff of all indicia of managerial authority over Appleton) Blackford persuaded the Commissioners to implement two alternative actions. The first was to offer the vacant Executive Director's Position to one Herman Jones and the second was to offer an Acting

14

Executive Director Position to defendant Elders, (once Blackford received information that she deemed disqualified Mr. Herman Jones).

(25) At its March 1999, monthly commission meeting, it was made public that the commissioners had elected to offer the job to one Herman Jones, the former Executive of the West Virginia commission.

(26) However, at the recommendation of defendant Blackford, in her capacity as Chairperson of the Executive and Personnel Committee, the commissioners elected not to go forward with their interim decision to hire Mr. Jones in light of articles that were printed in newspapers of general circulation throughout the state of Connecticut.

(27) These articles accused Mr. Jones of having frequently clashed with his West Virginia Commissioners and pondered the wisdom in hiring a person who apparently possessed the same militant and racist characteristics that they found in Mr. Martin.

(28) After revealing this decision, the Commissioners, again acting upon the recommendation of defendant Blackford, announced that they had voted to employ Cynthia Watts Elder to serve as the Commission's interim executive director, despite the fact that as Elder had not applied for the position nor otherwise expressed a formal interest in staffing it.

(29) Thereafter, in June of 1999, Watts Elder was summarily appointed to the commission's executive director's position.

(30) At the time of Elder's appointment, according to her resume, she possessed absolutely no experience whatsoever in civil rights enforcement and

had never staffed a position where she planned and supervised the work of subordinate employees or where she was assigned primary responsibilities for overseeing the operations of a work unit or other entity. .

(31) Moreover, plaintiff contends that since he was rejected notwithstanding his superior qualifications to the chosen applicant, defendants excluded his application by subjecting him to discriminatory selection criteria and/or by selecting and preferring Elder due to discriminatory criteria.

(32) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, persuaded the remaining Commissioners to reject Plaintiff's application despite his superior qualifications and due solely to the fact that he was a black employee in Martin's perceived racist and militant administration and that simultaneously defendants persuaded the remaining Commissioners to select Watt-Elder because she is female and black and due to defendants' hope that by selecting a less qualified black employee defendants could successfully defend themselves against any subsequent lawsuit that the plaintiff might commence. As such, plaintiff is entitled to such relief as provided by law or in equity.

**COUNT II:  RETALIATORY REMOVAL OF PLAINTIFF
FROM DEPUTY DIRECTOR POSITION**

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in Count One of the Complaint.

(2) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following acts of disparate treatment retaliation-discrimination:

(3) Prior to Plaintiff's removal from the Commission's Deputy Director for Enforcement position, defendant Elder was quoted in the August 25[th,] 1999 edition of the Journal Inquirer as having said that "Martin had a track record of bringing on individuals he either worked with or wanted to hire, and it was not an appropriate process. **Most were minorities, so the other staff, and particularly Caucasians, saw all of these faces that may not have been brought on through the customary and open process … .**" Additionally, in an article published in the Hartford Courant on September 11, 1999, entitled "Firing Jolts Agency", Defendant Elder is quoted as having stated in her August 25th interview with the Journal Inquirer that "**Martin had created a climate of racial tension within the agency and exercised favoritism toward African American in his hiring and promoting.**"

(4) Upon learning of the Inquirer's article, a number of defendants' minority employees, including plaintiff, challenged the factual premises upon which the allegations were based.

(5) Upon learning of these challenges, defendant Elder acting in conjunction with defendant Blackford, elected to remove Plaintiff from his deputy director's position due, in part, to Plaintiff's opposition to defendant Elder's discriminatory remarks and due in part to defendants' desire to reduce its population of black employees in an effort to lessen the white employees perception of racial tension and discrimination in the agency.

17

(6) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

## COUNT III: DENIAL OF RIGHT TO COMPETE
## FOR VACANT DIRECTOR OF FIELD OPERATIONS POSITION

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in Count two above.

(2) In addition, defendants Elder, Blackford and Appleton, acting in concert with each other, refused to allow plaintiff to compete for the Commission's vacant Director of Field Operations Position in September 1999 by summarily placing a white male employee, Donald Newton, in the position.

(3) These facts show that sometime prior to Thursday, September 9, 1999, Elder, Appleton and Blackwell met for the purpose of planning plaintiff's removal from his deputy director of enforcement position and the staffing of the Commission's vacant Chief of Field Operations position.

(4) During these meetings, and in furtherance of their desire to preclude plaintiff from having an opportunity to compete for this position, defendant Elder, acting in her capacity as the Executive Director of the Commission elected to summarily promote Donald Newton, white male, employee into the position. In doing so, Elder was motivated by her desire to terminate and/or preclude the employment of all black managerial employees in the Martin administration.

(5) Although, defendant Elder has not given Plaintiff a 'formal' reason for not allowing him to compete for the vacant position, defendants did offer an explanation to the EEOC in response to plaintiff's administrative complaint.

There, defendants, acting through defendant Elder stated, "the position of Regional Manager was reclassified to the Chief of Field Operations position".

(6) Plaintiff states that this reason is false because Newton failed to satisfy the state's reclassification requirements inasmuch as he neither possessed the supervisory experience nor was he performing the duties and responsibilities of the job, as required by statute, at the time of the alleged reclassification decision.

(7) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT IV: WRONGFULLY TERMINATION

(1) Plaintiff adopts and incorporates each and every allegation contained in Counts one through three above.

(2) In addition to the above acts of illegal discrimination, Plaintiff was subjected to the following conduct in violation of the State of Connecticut public policy against wrongful termination.

(3) These facts show that in addition to terminating plaintiff's employment, defendant Elder, Blackford and Appleton did so under circumstances that: (a) violated the State's Opening Meeting Act, [See Section 1-21, CGS]; and (b) defamed plaintiff's character and reputation, thereby making it all but impossible for plaintiff to find future employment in his chosen profession.

(4) In this respect, the facts show that the named defendants planned

plaintiff's termination in secrecy so that plaintiff would not learn of their intent to discharge him until after plaintiff's termination had been perfected.

(5) Consequently, plaintiff was deprived of a twofold statutory opportunity. These were: (a) plaintiff right to have the issue pertaining to the termination of his employment addressed in an "opened" as opposed to a "closed" session of the commission's meeting; and (b) plaintiff right to be present and participate in the both the opened and closed sessions, during the commission's deliberations pertaining to his employment. (See Section 1-18a (2), CGS)

(6) In this respect, plaintiff states that this denial deprived him of a substantial right inasmuch as plaintiff's participation in the discussion could have altered the outcome of the commission's deliberations.

(7) This is so because pursuant to the Regulations of Connecticut State Agencies, defendant Elder's, the Executive Director, recommendation to hire or fire a deputy director is subject to the advice and consent of a majority vote of the commissioners.

(8) Similarly, the facts reveal that plaintiff was terminated under circumstances that defamed plaintiff's reputation and character.

(9) Here the pertinent facts show that defendants' Elder, Appleton and Blackford conspired and designed a scheme whereby plaintiff would be removed from his office under such circumstances as would convey to the public that plaintiff was being removed as part of the new management strategy to clean house, that is, to rid the commission of all racist, incompetent and violent employees.

(10) In this respect, the facts show that immediately upon the adjournment of the commission meeting, Mr. Newton, in the company of a State Trooper, advised plaintiff that he must, (right, then and there), release the keys to his Office and all commission property and that plaintiff would be escorted by the officer into plaintiff's office so that plaintiff could remove all personal items belonging to him.

(11) Further, the State Trooper explained that he could not let plaintiff out of his sight until plaintiff had exited the state property. As such, the media observed plaintiff being escorted off state property and reported this fact.

(12) As a consequence thereof, many of plaintiff acquaintances telephoned him to express their sadness about his being arrested. Moreover, classmates of plaintiff's grade school children asked them why their father was arrested.

(13) IN CONCLUSION, Plaintiff suffered various forms of injuries, including severe forms of mental and emotional distress and depression arising out of his wrongful termination and caused as a direct and proximate consequence of the Defendants' illegal conduct.

## COUNT V – DEFAMATION

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in Counts one through four above.

(2) In addition Plaintiff was subjected to the following acts of defamation in violation of the laws of the State of Connecticut.

(3) As set forth above, defendant Elder was appointed to the position of Acting Executive Director of the Commission on Human Rights and Opportunities in March of 1999.

(4) As of defendant Elder's first day on the job, (on or about March 12, 1999) plaintiff commenced his first day of sick leave that lasted roughly two weeks.

(5) Thereafter, upon plaintiff's return to work he learned that defendant Elder had met with a number of CHRO's employees and had informed them that she had determined that plaintiff was not performing the duties and responsibilities of his job in a competent and proficient manner and based on these facts, that she had concluded that plaintiff was not qualified to perform the duties and responsibilities of the Deputy Director for Enforcement's position.

(6) Additionally, defendant Elder advised these employees that she would be taking corrective action to reign in plaintiff's incompetence.

(7) About the same time, Elder scheduled her first staff meeting with plaintiff. During this meet, Elder stated on several occasions that she had learned of plaintiff's incompetent performance and felt compelled to take urgent and immediate corrective action.

(8) Thereupon, plaintiff advised Elder that he vigorously disagreed with her contention and informed her that, by and large, plaintiff's performance of his duties and responsibilities had been pretty much reduced to instructions contained in several Compliance and Procedures Manuals that he had authored, in conjunction with various co-workers.

(9) Elder acknowledged having seemed these publications and represented that they chronicled plaintiff's incompetent performance. Thereupon, she instructed plaintiff to forthwith issue a memorandum directive to the Field Operation staff advising them to discontinue use of any and all materials that had been issued out of plaintiff's office.

(10) These directives were issued in accordance with plaintiff's instructions, despite defendant's refusal to identify any specific errors contained in these publications. Elder's only response to plaintiff's request was that she had talked to members of the commission's legal staff and was convinced that the publications were full of incorrect and damaging information.

(11) Thereafter, Elder identified the principal source of her information as being a white female staff attorney named Joan Parker.

(12) On another occasion, Elder summoned plaintiff to her office and advised him that she had been in contact with Mike Aggress, a white male staff attorney assigned to the Commission's Bridgeport Regional Office, and wanted plaintiff to get with him for instructions in how to investigate complaints alleging disability discrimination because she had commenced reading a Field Operation Interpretative Guideline (FOIG) that Aggress had written and she was truly amazed and impressed with the thoroughness and competency with which the document was drafted.

(13) Plaintiff advised Elder that he was not aware of any such document authored by Mike Aggress and asked for the privilege of seeing said document. Upon Elder producing it, Plaintiff advised her that he had authored it and that the

white male employee whom she attributed it to had had nothing, whatsoever, to do with it production.

(14) Upon learning this, Elder was shocked and, after composing herself, looked plaintiff in the eyes and stated "if this proves to be true, I will direct you to order the discontinuation of its use immediately".

(15) These statements were frequently published to third parties who had no legitimate need to receive the information.

(16) Each of these defamatory statements were false and, at the time Elder made them, she either knew them to be false and/or otherwise acted with a malicious and reckless disregard as to their truthfulness.

(17) Moreover, defendant waived any qualified privilege to which the statements may have otherwise enjoyed inasmuch as defendant acted maliciously and with a reckless disregard for the truthfulness of the statements.

(18) In addition to the aforementioned conduct, plaintiff was subjected to a third act of defamation arising out of the manner in which plaintiff's employment was severed and the treatment accorded him in connection therewith.

(19) Specifically, the facts descriptive of this conduct are set out above in paragraphs 9 through 13 of count four (4).

(20) Additionally it was part and parcel of defendants' Elder, Appleton and Blackford scheme to create an environment that would convey to the public that plaintiff was being removed as part of the new management strategy to clean house, that is, to rid the commission of all racist, incompetent and violent employees.

(21) In an effort to convey this message to the public, defendants Elder, Appleton and Blackford secretly planned plaintiff's removal and secretly arranged to have a member of the State's Department of Public Safety to be present for purposes of restraining plaintiff's mobility and to escort plaintiff from the premises.

(22) As such, the media observed plaintiff being escorted off state property by a state trooper and reported this fact.

(23) Plaintiff states that the only reason he was treated in this manner was defendants' desire to convey to the public that, like Martin, plaintiff, too, was an incompetent, hostile and violent black racist. Moreover, defendants opted to use the state trooper because the media had earlier widely publicized the fact that Martin was locked from his office and advised that if he attempted to re-enter the same, that he would be arrested for trespassing. Hence, defendants sought to convey to the public that plaintiff was being treated identical to the manner in which Martin had been treated because plaintiff possessed the same alleged reprehensible characteristics that Martin possessed.

(24) As a consequence thereof, many of plaintiff acquaintances telephoned him to express their sadness about his being arrested. Moreover, classmates of plaintiff's grade school children asked them why their father was arrested.

(25) Moreover, plaintiff states that the sole purpose of this conduct was to defame plaintiff's character and reputation and to instill fear and consternation in the minds of all future employers with whom plaintiff might seek employment.

(26) IN CONCLUSION, Plaintiff suffered various forms of injuries including, but not limited to, severe forms of mental and emotional distress and depression arising out of the defamatory conduct to which he was subjected which conduct was designed to and had the effect of, defaming plaintiff character and as such has, in reality, caused plaintiff to be unable to find gainful employment in plaintiff's chosen profession.

**COUNTS (VI) AND VII**
**DISCRIMINATORY REMOVAL FROM**
**ACTING EXECUTIVE DIRECTOR'S POSITION AND**
**INTENTIONAL INFLICTION OF EMOTIONAL DISSTRESS**

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in counts one through five above.

(2) In addition, plaintiff states that he was subjected to the following acts of discrimination and the intentional inflectional of emotional distress with respect to his removal from the Acting Executive Director.

(3) In this respect, the facts show that defendants Blackford and Appleton were motivated by their desire to prevent plaintiff from terminating the employment of defendant Appleton and to extract revenge for his having made a decision, during the period plaintiff served as the Acting Executive Director of the Commission, to place defendant Appleton on administrative leave and to threaten her with disciplinary action.

(4) These facts show that, as a result of conduct that Appleton engaged between the period of July 1997 and March 1998, that plaintiff deemed to be both insubordinate and incompetent, Plaintiff made a decision to place Appleton on

administrative leave which subjected her to disciplinary action up to and including termination.

(5) Upon Plaintiff attempting to serve notice on Appleton that she was being placed on administrative leave, Appleton advised plaintiff that she had been told by both commissioners Blackford and Robinson that plaintiff didn't have the authority to either supervise or discipline her.

(6) In an effort to illustrate plaintiff's lack of authority, defendant Appleton inscribed her insubordinate attitude in a notation that she wrote on the bottom of the notice placing her on leave. There she wrote: "If the commissioners do not approve this action I will return to work on Monday February 22, 1999".

(7) Traditionally, and by statute, the executive director has sole authority to hire and fire all staff personnel except for the commission's general counsel and its two deputy directors, [See CGS §46a-52 (c) – (e)].

(8) Thereafter plaintiff was required to meet with two members of the Commission's Administrative and Personnel committee, for the purpose of, among other things, explaining the basis-underlying plaintiff's decision and to advise them of plaintiff's proposed future course of action. Defendant Blackford notified plaintiff of the meeting and explained that she would not be able to attend.

(9) Thereafter, plaintiff met with Commissioners Robinson and Williams (both black males) and set forth the facts as plaintiff saw them. Plaintiff assured them that he did not intend to fire defendant Appleton and that; to the contrary,

he desired only to extract an unyielding commitment from her to comply with the statutory authority of Plaintiff's office.

(10) Given this understanding, a course of activities were agreed upon that would result in Appleton being returned to work and the convening of a fact-finding hearing for purpose of clarifying Appleton's role.

(11) However, the day after plaintiff notified Appleton that she was to return to work, plaintiff received a telephonic message from Commissioner Blackford instructing him that "effective immediately Appleton would no longer report to him and that plaintiff was to have no further contact with her regarding any commission matter and that during this time period Appleton would have sole authority to handle all budgetary and personnel matters".

(12) Thereafter, plaintiff learned that defendant Blackford and other Commissioners, acting in conjunction with the then Secretary of the Office of Policy and Management, (OPM) and the Commissioner of the Department of Administrative Services, (DAS), had met on numerous occasion during the period in which defendant Blackford were purporting to be working out a solution with plaintiff pertaining to Appleton and that the sole purpose of these meetings were to identify some black person in state government that they could be placed in charge of the commission.

(13)    In this respect, Elder explained that the commissioners actively solicited her for the position. Specifically, according to Elder, she was called out of a meeting and instantaneously offered the position and was told that she had to make up her right then and there (on the spot).

(14) Hence, plaintiff states that as direct and proximate consequence of the facts setout above, defendants made their decisions to terminate plaintiff's Acting Executive Director's appointment and to appoint Elders to the Acting Executive Director's position.

(15) Hence, plaintiff submits that the sole reason for recruiting Elder for the position was to shield defendant Appleton from having to submit, any longer, to the pretense of plaintiff's supervisory authority.

(16) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity.

**COUNT VIII, DISCRIMINATION WITHIN THE
TERMS AND CONDITIONS OF COMPENSATION**

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in counts one through seven above.

(2) In addition, plaintiff states that he was subjected to the following acts of discrimination within the terms and conditions of plaintiff's compensation.

. (3) Specifically, these facts show that in October 1998, following plaintiff's Acting Executive Director appointment in July 1998, plaintiff requested the Commissioners to appoint Cheryl Sharpe, a black female, to serve in the Acting Deputy Director For Enforcement position and to increase plaintiff's and Sharpe's compensation in according with state policy for performing duties in a higher classification.

(4) Thereafter, during the next four months, the issue of appropriate compensation was placed on the agenda of each commission meeting. During

these meetings defendant Appleton intentionally and knowingly offer numerous false and indefensible reasons as to why plaintiff's and Sharpe's salaries should not be increased in accordance with state policy.

(5) During this period, plaintiff and Sharpe salaries were fixed at various amounts substantially below that mandated by policy, notwithstanding the fact that plaintiff put forth uncontroversial proof that revealed the policy. Specifically, plaintiff presented the commissioners with a Memo that plaintiff had received from Shaun C. McDonough, Compensation Analyst for the Office of Policy and Management which stated that it was the state practice to fix the salary for personnel holding positions in the Executive Pay Plan at the mid point of the salary range for the position held by the employee.

(6) In an effort to get to the bottom of the issue, plaintiff submitted a written request to both Mark Ryan and Barbara Waters who, at the suggestion and urging of defendants Blackford and Appleton, knowingly and intentionally provided the commissioners with false and incorrect information. Specifically, (acting through Deputy DAS Commissioner, Al Mozola), they advised the commissioners that even though the Governor had established the compensation policy contained in the Shaun C. McDonough Compensation Directive, that notwithstanding this Directive, the commissioners were free to establish a difference salary formula if they choose to do so.

(7) Thereupon, plaintiff reminded DAS of the Compensation Policy Directive that DAS had given to the commission in 1994, following an attempt by the commissioners to increase the salaries of its statutory office holders, (that is,

the Executive Director, the Deputy Director(s) and the General Counsel), to an amount that exceeded that established in the Governor's Compensation policy but which remained within the salary range for each position.

(8) In a nutshell, in its 1994 Directive, DAS advised the commissioners that they did not have the authority to authorize the payment of a salary different from that established in the Governor's compensation policy, notwithstanding the fact that the salary established by the commissioners was within the range of compensation fixed in the Executive Pay Plan for the position.

(9) Ultimately, at the urging and suggestions of defendants Blackford and Appleton, the remaining Commissioners were persuaded that they should fix Plaintiff's salary at $90,000 per year as apposed to the $102,000 that plaintiff was entitled to be paid in accordance with the compensation formula established by the Governor. Additionally, plaintiff states on information and belief that defendant Elder was paid $102, 000 for the time she served as the commission's Acting Executive Director and that insofar as plaintiff has been able to ascertain; the only difference for the disparity in compensation is the gender of the respective parties.

(10) IN CONCLUSION, plaintiff states that defendants, acting collectively and individually, subjected him to those injuries hereinabove set forth and that, as such, plaintiff is entitled to such relief as provided by law or in equity and for all other necessary and proper relief.

## COUNT IX, DISPARATE TREATMENT DISCRIMINATION
## CHRO'S - REGIONAL MANAGER'S POSITION

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in counts one through eight above.

(2) In addition, plaintiff was discriminatorily denied employment by the defendant, CCHRO, acting through its Executive Director, defendant Elders and its Business Office Manager, defendant Appleton due to plaintiff's race and/or gender under the following terms and conditions.

(3) Sometime prior to November 11, 2001, CCHRO issued a vacancy announcement for a Regional Manager to be stationed in its Waterbury, West Central Office.

(4) The vacancy announcement sought applications from interested persons possessing the minimum qualifications for the position as set forth in the announcement and job specification.

(5) In response to the announcement, plaintiff prepared and submitted his application that, according to instructions, also constituted defendant's CCHRO's qualification examination.

(6) Thereafter, the State of Connecticut's Department of Administrative Services, notified plaintiff that he had passed the eligibility examination and that this information was being transmitted to the Commission on Human and Rights and Opportunities.

(7) Plaintiff received no further notice about the status of the vacancy until on or about December 1, 2002 at which time Plaintiff learned that the position had been filled.

(8) Until receiving this notice, plaintiff was of the opinion that CCHRO had elected to terminate its efforts to fill said vacancy due to reason that neither defendant Blackford, Elder or Appleton wanted to place Plaintiff in said position. .

(9) However, on or about December 1, 2002 plaintiff learned of the discriminatory act as a result of an employee of CCHRO calling plaintiff's residence and telling plaintiff that the position had been staffed.

(10) Furthermore, plaintiff states that the only reasons he was not hired in the vacant position were due to defendants electing to continue to discriminate against plaintiff as a result of his prior employment with CHRO and due to defendants Blackford, Elder and Appleton electing to retaliate against plaintiff inasmuch as plaintiff filed his previous suit against defendants accusing them of various act of illegal discrimination.

(11) Likewise, plaintiff states that the conduct that forms the subject matter of this complaint is a mere continuation of the conduct described above and constitutes defendants' discriminatory design to deny plaintiff employment because of his race and gender.

(12) IN CONCLUSION, plaintiff states that Blackford, Appleton and Elder's decision to deny him employment in the Commission's vacant managerial position was motivated by a desire to retaliate against plaintiff for having (a) sought of terminate defendant Appleton's employment with the Commission in 1999; and (b) filed a prior lawsuit against defendants.

## COUNT X: DEPRIVATION OF CONSTITUTIONAL PROTECTED LIBERTY

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in counts one through nine above.

(2) The facts pertinent to this cause of action are hereinafter setout. They show that defendant, State of Connecticut, acting through its' Commission on Human Rights and opportunities employed plaintiff in August 1991.

(3) The named defendants and a number of state elected officials, repeatedly made false statements to the media that were defaming and that resulted in stigmatizing plaintiff's reputation, good name and integrity.

(4) Specifically, for a period of time in excess of two years, the named defendants, made and published, verbal and non-verbal statements, which were false and which defendants knew to be false alleging that plaintiff was incompetent and had mismanaged the Commission was his period of employment.

(5) Similarly, the named defendants also accused plaintiff of having rendered the commission dysfunctional with respect to its ability to process complaints of discrimination.

(6) In like manner, these individuals accused plaintiff of being a racist and of having subjected the commission's white employees to a pattern and practices of egregious discrimination that, according to defendants, resulted in plaintiff discriminatorily replacing all of the commission's White managerial employees with Black employees.

(7) In essence, defendants' false statements accused the plaintiff of being grossly incompetent with respect to plaintiff's ability to manage the Field Operations Division and with respect to plaintiff's ability to administer the State's anti-discrimination laws and regulations.

(8) Further the facts show that, at the time of plaintiff's discharge, defendant Blackford, Appleton and Elder engaged conduct that caused these defamatory statements to be republished by the media. Specifically, these defendants elected to discharge plaintiff in such a manner as to communicate to the public that plaintiff's tenure with the commission had been so disastrous as to make it necessary for them to have plaintiff forcibly removed off state property.

(9) In this respect, defendants made arrangements to have a state trooper to escort plaintiff off state property which fact was widely published in the state print media and which had the effect of communicating to all future employers, to whom plaintiff may apply in the future, that plaintiff possessed criminal proclivities that made it necessary for defendants to invoke the state's criminal law processes in order to remove plaintiff from its' premises.

(10) In other words, plaintiff states that the manner in which defendants elected to discharge plaintiff, constitutes a non-verbal statement that was communicated to, and published by the media, which resulted in plaintiff being subjected to public opprobrium thereby damaging plaintiff's reputation and precluding all possibilities of plaintiff ability to find employment in his chosen profession.

(11) Further, the facts show that not only did defendants rely on these false statements to terminate plaintiff's employment but that defendants have consistently relied on these false statements to bar plaintiff from future employment with the State of Connecticut. In this respect, the facts show that in addition to relying on these false statements to support their decision to terminate plaintiff's employment, defendants also relied on these knowingly false statements to deny plaintiff's employment in their Director of Field operations position.

(12) Additionally, the facts show that defendants failed to provide plaintiff a process in which plaintiff could attempt to clear in name and reputation.

### COUNT XI, DEPRIVATION OF PLAINTIFF'S RIGHT OF ASSOCIATION

(1) Plaintiff adopts and incorporates herein each and every allegation contained in counts one through ten above.

(2) In addition, plaintiff states that, as a direct and proximate result of the discriminatory conduct of defendant Blackford, Elder and Appleton as hereinabove set out, he was terminated from employment and simultaneously denied the right to compete for defendant's, Commission On Human Rights and Opportunities, Director of Field Operations position and defendants' Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to free speech and association in violation of the First and Fourteenth Amendments, United States Constitution; Section 3, 4, and 14 of the Constitution, State of Connecticut, and the protections afforded plaintiff by Section 31-51q, of the Connecticut General Statutes.

(3) These facts show that the State of Connecticut, acting through its' Commission on Human Rights and opportunities employed plaintiff in August 1999. Specifically, the Commission's Chair and Vice Chair Persons, Dr. Leslie J. Brett and Mr. Cesar A. Batalla, employed Plaintiff pursuant to a recommendation made by its' recently employed Executive Director, Mr. Louis Martin. The Commission employed Martin in January 1991.

(4) Plaintiff was employed in the Commission's Deputy Director for Enforcement position. Execution of the responsibilities of this position, required Plaintiff oversee the enforcement of the Connecticut's Discriminatory Practices Act, as Amended, (See CGS, Sections 46a-51, et seq.), subject to the instructions and directions that plaintiff received from Louis Martin, the Commission's Executive Director and such policy directives and regulations implemented by the commission.

(5) Plaintiff was assigned the responsibilities of overseeing the Commission's: (a) Field Operations Division, which was responsible for its complaint investigation activities; (b) Public Hearing administrative activities; and (c) Affirmative Action/Contract Compliance activities.

(6) The commission's hierarchical structure, including its powers and duties are set out in the Act. Essentially, the Act provides that the commission is to be governed by a nine-member panel of commissioners who are to establish commission policies and oversee its total effective and efficient operation. To achieve this goal, the Act empowers the commission with broad authority which includes the hiring of the commission's Executive Director and General Counsel.

Similarly, by way of the commission's duly enacted regulations, the commission must lend its advice and consent to the hiring of a deputy director.

(7) In like manner, the Act provides that the Executive Director shall serve as the chief executive officer of the commission and in this capacity the executive shall be responsible for overseeing the day-to-day operations of the commission which includes, subject to the policy making input of the commission, the authority to promulgate, administer and oversee the commission's budget, the authority to administer and oversee all personnel matters, including the hiring and firing of staff, and the responsibility of implementing the requisite processes and procedures essential to effective enforcement of the Act's, i.e., the elimination of all vestiges of discrimination made illegal by the Act.

(8) As such, in order for plaintiff (and all managerial personnel) to perform the duties and responsibilities of his job, it was essential for plaintiff to come into daily association with Mr. Martin for purposes of addressing matters of public concern, that is, the ways and means, the policies and procedures that the commission's Field Operations Division was to implement and administer in its' effort to execute its' statutory mandate to eliminate all vestiges of illegal discrimination through effective and efficient complaint investigation and enforcement.

(9) During the eight plus years in which plaintiff staffed the commission's Deputy Director for Enforcement position, plaintiff (and again, all of the commission's managerial employees) was required to come into daily association with Mr. Martin the purposes set out above.

(10) Notwithstanding the need to associate with Martin for purpose of addressing issues of public concern, i.e., the effective enforcement of the Connecticut Anti-Discrimination Act, defendant Blackford, Appleton and Elder elected to cause the Commission to discharge plaintiff for engaging the very act mandated by the statutory scheme and without which the statutory scheme could not be enforced in the collegiate manner in which the Act contemplates, that is, a hierarchical division of labor structure.

(11) In this respect, plaintiff notes that the only reason defendants have given for their decisions to discharge and not rehire plaintiff, is contained in defendants' Answer to plaintiff's original complaint. There, in their response to paragraphs 27 and 28, defendants explained that their decision to discharge not to rehire plaintiff was based on:

> " ...**decisions that 'Martin and [plaintiff] made which effect was to eventually rid the commission of all of its white managers and replace them with black managers'."** I

(12) Inasmuch as the facts clearly show, as setout above, that Martin possessed the exclusive authority to hire or fire staff, it's obvious that defendants' explanation is a mere façade to hide the real reason that motivated their adverse decisions, that being, plaintiff's association with Martin.

(13) Additionally, plaintiff submits that the facts, as setout in the preceding counts, clearly demonstrate that the genesis of the problem that arose between Martin and the defendants grew out of the manner in which Martin exercised his managerial powers with respect to the commission's personnel, especially its' white personnel. From the viewpoint of defendants and many elected officials,

Martin exercised these powers in a racial manner so as to subject the commission's white employees to a pattern and practice of race discrimination.

(14) However, despite the almost daily association that plaintiff (and all managerial personnel) had with Martin respecting the commission's enforcement processes and procedures, including its' staffing needs, no white employee ever accused plaintiff of having subjected him or her to race based discrimination.

(15) Hence, plaintiff submits that the facts clearly establish that his association with Martin for the purposes hereinabove setout did not interfere substantially or even immaterially with plaintiff's bona fide job performance or with plaintiff's working relationship with defendants.

(16) IN CONCLUSION, plaintiff submits that defendants decisions to cause Plaintiff's discharge and not rehire plaintiff for exercising his First Amendment protected right to freedom of association constitutes a violation of plaintiff's rights as protected by the federal and state constitutions and Section 31-51q, CGS.

## COUNT XII, DEPRIVATION OF RIGHT OF FREE SPEECH ARISING OUT OF PLAINTIFF'S WHISTLE BLOWER COMPLAINT

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in counts one through eleven above.

(2) In addition, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for the Commission On Human Rights and Opportunities, Director of Field Operations position and Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to free speech and association in violation of the

First and Fourteenth Amendments, United States Constitution; Section 3, 4, and 14 of the Constitution, State of Connecticut, and the protections afforded plaintiff by Section 31-51q, of the Connecticut General Statutes.

(3) The facts pertinent to this cause of action are hereinafter setout. Plaintiff states that within days of his notifying the commissioners of the conduct that had come to his attention respecting defendant Appleton's misfeasance and/or malfeasance in office, he also notified them of the fact that he had filed a Whistle Blower complaint with the Office of the State Auditors detailing the conduct that he had earlier called to their attention.

(4) Thereafter, within days of notifying defendants of his having filed said complaint; plaintiff was removed from his position as Acting Executive Director under the discriminatory circumstances set out above.

(5) Plaintiff states that he believes that defendants' decision to remove his Acting position was made in direct retaliation for his having filed the Whistle Blower complaint.

(6) Further plaintiff states that upon investigating the complaint, the State Auditors found that defendant Appleton had been derelict in the performance of her duty as claimed by plaintiff and that her conduct in all likelihood caused the State to lose thousands of dollars in interest payment.

(7) IN CONCLUSION, plaintiff states that his filing the complaint constitutes protected speech under the laws set out in the preceding count inasmuch as the speech was on a matter of public interest and that defendants'

retaliatory conduct constitutes a deprivation of plaintiff's rights protected by said laws.

### COUNT XIII: DEPRIVATION OF PLAINTIFF'S RIGHT
### TO EQUAL PROTECTION OF THE LAW
### AND PATTERN AND PRACTICE DISCRIMINATION

(1) Plaintiff adopts and hereby incorporates each and every allegation contained in counts one through twelve above.

(2) In addition, plaintiff states that he was terminated from employment and simultaneously denied the right to compete for the Commission On Human Rights and Opportunities, Director of Field Operations position and Executive Director's position under terms and conditions that deprived plaintiff of his constitutional protected right to the equal protection of the law.

(3) In support of this cause of action plaintiff states that to the extent defendants elected to terminate plaintiff's employment and refuses to rehire plaintiff due to plaintiff having associated with Martin on the same terms and conditions as did all of the commission's white managerial employees, that said treatment constitutes a deprivation to plaintiff's constitutionally protected rights to equal treatment under laws of the United State and State of Connecticut.

(4) IN CONCLUSION, plaintiff states that subsequent to his discharge in 1999, that he has been subjected to numerous acts of illegal discrimination by defendants Blackford, Elder and Appleton and members of their staff acting pursuant to instructions and/or with their knowledge as result of plaintiff's efforts to secure re-employment with the State of Connecticut and that each of said acts of illegal discrimination were engaged by the named defendants, in conjunction

with other state employees acting under color of the constitution, laws, regulations and policies of the United States and the State of Connecticut.

## SECTION IV REMEDIAL RELIEF

WHEREFORE, premises considered, Plaintiff prays that this court schedule this matter for trial on the merits before a jury of plaintiff's peers and thereupon, after duly considering all the relevant and material evidence, enter its Order awarding plaintiff's such relief as he maybe entitled, in equity and at law; and for all other necessary and proper relief.

Respectfully Submitted,

Jewel E. Brown.

By: _____.

    Jewel E. Brown, pro se
    21 BREWSTER
    SOUTH WINDSOR, CT. 06074
    PHONE (860) 644-5379
    FAX (860) 644-6551
    E-MAIL: employmentpa@aol.com

## CERTIFICATE OF SERVICE

Plaintiff hereby certifies that he has caused a copy of Plaintiff's Third Substituted Complaint, As Amended to be served upon Defendants' Attorneys this 18th day of April, 2008, by depositing a copy of the same in U. S. mail, postage prepaid, and addressed to Defendants' Attorney's address shown of record as 55 Elm Street, Hartford, CT, 06141.

Respectfully submitted

By_____
    Jewel Brown, pro se